J-S75042-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RUSSELL B. CARPENTER, | |
| Appellant | No. 1569 EDA 2014 |

Appeal from the PCRA Order entered May 2, 2014,
in the Court of Common Pleas of Philadelphia County,
Criminal Division, at No(s): CP-51-CR-0010394-2011

BEFORE:  ALLEN, LAZARUS, and MUNDY, JJ.

MEMORANDUM BY ALLEN, J.:                **FILED DECEMBER 08, 2014**

Russell B. Carpenter ("Appellant") appeals from the order denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. sections 9541-46.  We affirm.

The pertinent facts and procedural history have been summarized as follows:

> Following a waiver trial before the Honorable Angelo J. Foglietta, [Appellant] was found guilty of unlawful possession of firearms, firearms not to be carried without a license, and carrying firearms on the public streets in Philadelphia.  Jeffrey Azzarano, Esq., represented [Appellant] at trial.  Subsequently, [Appellant] obtained new counsel who made an oral motion for extraordinary relief on his behalf, alleging the ineffectiveness of trial counsel.  On May 15, 2012, [Appellant's] oral motion for extraordinary relief was denied, and the trial court proceeded to sentencing.  Appellant received an aggregate sentence of three to six years' imprisonment, followed by three years of probation.

*Commonwealth v. Carpenter*, 2014 Pa. Super. LEXIS 1348 (Pa. Super. 2014), unpublished memorandum at 1-2 (footnote omitted).

Following the denial of post-sentence motions, Appellant filed a timely appeal to this Court, in which he reiterated his allegations of trial counsel's ineffectiveness. We summarized these claims as follows:

> Appellant argues that trial counsel was ineffective for failing to call any witnesses where trial counsel was under the misimpression that operability of the firearm was an element of the offenses. Appellant also argues that trial counsel was ineffective for failing to cross-examine the arresting officer about his preliminary hearing testimony, in which he testified that he could not be certain the item he saw [Appellant] discard was really a gun (the gun was never recovered). Appellant also claims that trial counsel should have called an expert witness to testify that police officers routinely mistake toy guns or replicas for real firearms.
>
> As stated above, these claims were raised in post-trial and post-sentence motions, and evidentiary hearings were held, at which trial counsel testified. The trial court disposed of these claims on the merits, and addressed them in its Rule 1925(a) opinion. The trial court acknowledges the general rule in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), that defendants should wait until the collateral review phase to raise claims of ineffective assistance of counsel. (Trial court opinion, 6/7/13, at 4.) Nonetheless, the trial court urges us to review [Appellant's] claims now, on direct appeal, pursuant to the so-called "*Bomar* exception" to the *Grant* rule. *Id.*; *see Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied*, 540 U.S. 1115 (2004) (recognizing a limited exception to the *Grant* deferral rule where there was an extensive record regarding the ineffectiveness claims, including a full hearing where counsel testified, and the trial court ruled upon all claims).

*Carpenter*, unpublished memorandum at 2-3.

Before addressing Appellant's direct appeal claims of ineffectiveness of counsel, this Court noted that our Supreme Court had recently revisited its *Bomar* holding in *Commonwealth v. Holmes*, 79 A.2d 562 (Pa. 2013). After thoroughly discussing the high court's decision, we concluded that Appellant's claims did not fit into either exception recognized by our Supreme Court in *Holmes*. *See Carpenter*, unpublished memorandum at 3-6. Thus, this Court was "constrained to affirm the judgment of sentence, without prejudice to [Appellant's] right to re-raise his ineffectiveness claims in a timely PCRA petition." *Id.* at 6 (footnote omitted).

On March 17, 2014, Appellant filed a counseled PCRA petition, in which he "re-raised" his claims of trial counsel's ineffectiveness. On March 25, 2014, the PCRA court issued a rule to show cause upon Appellant, and oral argument was scheduled for May 2, 2014. On April 23, 2014, the Commonwealth filed a motion to dismiss Appellant's PCRA petition. Following argument on May 2, 2014, the PCRA court granted the Commonwealth's motion to dismiss Appellant's petition because Appellant "failed to provide this Court with any new evidence which would warrant the granting of PCRA relief." PCRA Court Opinion, 6/18/14, at 1. Thereafter, Appellant waived the Pa.R.Crim.P. 907 requirements, and he timely filed the instant appeal. Both Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

Appellant raises the following issue:

Did the [PCRA court] err in ruling that [Appellant's] trial counsel's failure to call eyewitnesses, experts, or confront the Commonwealth's lone witness with his preliminary hearing testimony did not constitute ineffective assistance of counsel?

Appellant's Brief at 2.

In reviewing the propriety of an order granting or denying PCRA relief, an appellate court is limited to ascertaining whether the record supports the determination of the PCRA court and whether the ruling is free of legal error. *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009). We pay great deference to the findings of the PCRA court, "but its legal determinations are subject to our plenary review." *Id.* To be entitled to relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that the conviction or sentence arose from one or more of the errors enumerated in section 9543(a)(2) of the PCRA. One such error involves the ineffectiveness of counsel.

To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Id.* "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." *Id.* This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no

reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. *Id.* at 533. A finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

In assessing a claim of ineffectiveness, when it is clear that appellant has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Travaglia*, 661 A.2d 352, 357 (Pa. 1995). Counsel will not be deemed ineffective if any reasonable basis exists for counsel's actions. *Commonwealth v. Douglas*, 645 A.2d 226, 231 (Pa. 1994). Even if counsel had no reasonable basis for the course of conduct pursued, however, an appellant is not entitled to relief if he fails to demonstrate the requisite prejudice which is necessary under Pennsylvania's ineffectiveness standard. *Douglas*, 645 A.2d at 232. Counsel cannot be deemed ineffective for failing to pursue a meritless claim. *Commonwealth v. Loner*, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*), *appeal denied*, 852 A.2d 311 (Pa. 2004).

Moreover, trial counsel's strategic decisions cannot be the subject of a finding of ineffectiveness if the decision to follow a particular course of action was reasonably based and was not the result of sloth or ignorance of available alternatives. *Commonwealth v. Collins*, 545 A.2d 882, 886 (Pa.

1988) (cited with approval by **Commonwealth v. Hall**, 701 A.2d 190, 204 (Pa. 1997)). Counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." **Commonwealth v. Ervin**, 766 A.2d 859, 862-63 (Pa. Super. 2000) (quoting **Commonwealth v. Miller**, 431 A.2d 233, 234 (Pa. 1981). Our Supreme Court has defined "reasonableness" as follows:

> Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable* basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

**Commonwealth v. Pierce**, 527 A.2d 973, 975 (Pa. 1987) (quoting **Com. ex rel. Washington v. Maroney**, 235 A.2d 349, 352-53 (Pa. 1967)). **See also Commonwealth v. Clark**, 626 A.2d 154, 157 (Pa. 1993) (explaining that a defendant asserting ineffectiveness based upon trial strategy must demonstrate that the "alternatives not chosen offered a potential for success substantially greater than the tactics utilized"). A defendant is not entitled to appellate relief simply because a chosen strategy is unsuccessful. **Commonwealth v. Buksa**, 655 A.2d 576, 582 (Pa. Super. 1995).

In addressing Appellant's claims of ineffectiveness raised in his Pa.R.A.P. 1925(b) statement, the PCRA court relied upon its prior opinion filed in response to Appellant's direct appeal. After careful review, we

conclude that the June 7, 2013 seventy-six page opinion previously filed by the Honorable Angelo J. Foglietta cites at length to the testimony provided during the pertinent evidentiary hearings, and discusses his assessment of its credibility. Further, Judge Foglietta applies correctly the pertinent PCRA standards, and thoroughly explains why, given his credibility determinations, Appellant's ineffectiveness claims lack merit. **See** Trial Court Opinion, 6/7/13. We therefore adopt Judge Foglietta's June 7, 2013 opinion as our own in disposing of the present appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2014

COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PA | : | CP-51-CR-0010394-2011 |
| v. | : | TRIAL DIVISION |
| RUSSELL CARPENTER | : | CRIMINAL SECTION |
| | : | SUPERIOR COURT NO.: 2685 EDA 2012 |

## OPINION OF THE TRIAL COURT

This is defendant, Russell Carpenter's, appeal of this Court's ruling of September 5, 2012. The defendant timely filed a Notice of Appeal on September 11, 2012.

This case has a long and drawn out post-trial history with several extensive hearings and on-the-record arguments on the issue of original trial counsel's effectiveness. Every benefit of the doubt and every available remedy has been afforded to this defendant in his requested pre-sentencing and post-trial motions for relief. Despite the numerous opportunities granted by this Court to this defendant, the end result is that the finding of guilt would not have changed had the testimony presented to this Court in post-trial relief been presented in the original trial of this matter. Therefore, it is requested that the decisions and determinations as to the defendant's guilt and his trial counsel's effective assistance be upheld on appeal.

Defendant was charged with firearms violations, 18 Pa.C.S. §6105 (Possession of Firearm Prohibited); 18 Pa.C.S. §6106 (Firearms Not to be Carried without a License); and, 18 Pa.C.S. §6108 (Carry Firearms Public in Philadelphia County).

The defendant was represented by Jeffrey Azzarano, Esquire, at a non-jury trial. It is the representation provided by Mr. Azzarano that the defendant subsequently asserts was ineffective.

1

Thereafter, Frank M. Spina, Esquire and Jonathan Altschuler, Esquire, entered their appearance and assumed the representation of the defendant in the sentencing, post-trial and, now, in the appellate phases of this matter.

The non-jury trial of this case began on February 29, 2012. It was completed a week later on March 7, 2012, at which time the defendant was found guilty on the above charges. He was subsequently sentenced on May 15, 2012 to 3 to 6 years incarceration to be followed by 3 years probation. He was also instructed to attend anger management/drug/alcohol programs and undergo drug screenings while on probation. Sentencing was within both the sentencing guidelines and the sentencing statute, as defendant was convicted of three (3) separate felonies and sentenced on the lead charge of 18 Pa.C.S. §6105, with the other charges merging into it for sentencing purposes. There are no appellate issues raised in regard to the sentence imposed.

A 1925(b) Order was issued on defendant on September 19, 2012. On October 5, 2012, the Defendant filed his 1925(b) Statement in which he has raised the following issues:

1. Defendant's trial counsel was ineffective for failing to call eyewitnesses whose existence he knew or should have known of, who were available to testify at trial, and whose testimony at the post sentence hearing was exculpatory, and hence, the failure to call them clearly prejudiced the Defendant in the verdict rendered.

2. Defendant's trial counsel was ineffective for failing to call an expert witness in the field of firearms examination, where the witness was available to testify at trial and whose testimony at the post-sentence hearing was exculpatory, and hence, the failure to call the expert witness prejudiced the Defendant in the verdict rendered.

3. Where Defendant was charged with possessing a firearm, Defendant's trial counsel was ineffective for failing to cross-examine the Commonwealth's only witness regarding the witness's prior sworn testimony wherein he testified that he was unsure that what he observed was a "real' gun.

2

RR5

4.  The evidence was insufficient as a matter of law to support a conviction of the Defendant on the charges of Possession of a Firearm Prohibited, Firearms Not to be Carried without a License, and Carrying Firearms on Public Streets in Philadelphia because the evidence did not establish beyond a reasonable doubt that the object observed was a "real" firearm.

Subsequent to the March 7, 2012 verdict, this Court heard extensive argument and post-trial testimony from defendant's original trial counsel, referring counsel, a firearms expert, several alleged eyewitnesses, as well as the testimony of the defendant himself addressing the above issues on appeal. This Court concluded that none of this testimony heard post-trial would have changed the outcome of the initial trial, nor did it support any aspect of the claims of ineffective assistance of counsel by Mr. Azzarano.

For the reasons set forth herein, it is respectfully requested that this Court's findings of fact and conclusions of law in regard to its decisions on the defendant's various post-trial motions, to wit, the sufficiency of the evidence supporting the defendant's conviction, and his trial counsel's effectiveness, be affirmed on appeal.

Despite all of the issues raised by defendant's post-trial/sentencing counsel and all of opportunities granted the defendant, in the end, the parties agreed that this case simply came down to a matter of credibility of all of the witnesses, including the credibility of the defendant's initial trial counsel, Jeffery Azzarano, Esquire, in regard to his trial strategy, and those who testified on the defendant's behalf during the post-trial phase.

This Court determined that the prosecution's witness at the original trial was more credible than those alleged eyewitnesses presented by the defense, as explained herein, and the outcome of the February 29, 2012/March7, 2012 trial would not have been different if all of these witnesses had testified at that time. This Court simply did not believe the testimony of

3

certain of defendant's witnesses nor did it find certain witnesses' testimony relevant to the legal issues at hand.

Even though this case boiled down to a matter of credibility, since the Defendant has raised claims of ineffective assistance of counsel, as a threshold matter, it must be acknowledged that such claims are normally withheld until collateral review proceedings. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (Pa. 2002). As recognized in *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853-54 (Pa. 2003), ineffective assistance claims are, in certain circumstances, cognizable within the chain of the direct challenge to the verdict. *Commonwealth v. Chmiel*, 585 Pa. 547, 613, 889 A.2d 501 (Pa. 2005) (explaining *Bomar* to hold that claims of counsel ineffectiveness reviewed in post-sentence proceedings were properly raised, preserved, and addressed in trial court).

Here the matters complained of on appeal were fully tried over numerous post-sentence hearings, the issues were extensively briefed and vigorously and zealously argued by successor defense counsel within the chain of the direct challenge to the verdict. The issue of Mr. Azzarano's effective assistance of counsel was ripe for determination in these collateral review proceedings as to whether there was "merit to Defendant's underlying claim," whether trial counsel had a "reasonable basis for his course of conduct," and whether "there is a reasonable probability that but for the act or omission in question, the outcome of the proceeding would have been different." *Id.*

In order to be eligible for relief under the PCRA, an appellant must prove by a preponderance of the evidence that the conviction or sentence he is collaterally attacking resulted from one of seven specifically enumerated circumstances set forth in 42 Pa.C.S. § 9543. To establish a claim of ineffective assistance of counsel under §9543(a)(2) of the PCRA, a

4

defendant must show that: (1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (Pa. 1999).

This Court has provided this defendant with every opportunity to show that the outcome of the trial may have been different had this course of conduct been employed by original trial counsel or had the witnesses provided testimony in his defense. Despite the degree of post-trial latitude granted to this defendant in the *four (4)* extensive post-trial hearings, the defendant did not meet his burden in proving trial counsel was ineffective by a preponderance of the evidence.

In reviewing all of the evidence, this Court concluded that 1) there was no merit to this defendant's claims; 2) that original trial counsel, Mr. Azzarano, had a reasonable basis for the course of conduct employed at trial; and, 3) the outcome of the proceedings would not have been different had these witnesses testified. Under a totality of the circumstances analysis, this Court re-considered all of the evidence and weighed it accordingly in rendering its post-trial decision that this defendant was not entitled to the requested post-trial relief.

The substance of each hearing is addressed separately as follows:

### THE FEBRUARY 29, 2012 TRIAL

Initially, on February 29, 2012, the Commonwealth brought its case against the defendant with Jeffrey Azzarano, Esquire, as his trial counsel. The Commonwealth was represented by ADA Gauri Gopal.

Prior to the taking of testimony in this matter, this Court performed a colloquy of the defendant in regard to his decision to waive his right to a jury trial. Upon the conclusion of the colloquy, this Court was satisfied that the defendant had voluntarily, knowingly and intelligently

5

waived said right. (N.T., 02-29-12, P. 4, L. 13 to P. 9, L. 15). The defendant has not raised the jury trial waiver as an issue on appeal.

The Commonwealth presented the testimony of Philadelphia Police Officer Justin O'Brien, badge no. 1981, who was assigned to the 35th Police District on the day in question. Officer O'Brien was the only witness to testify at trial. The Commonwealth's exhibits, described below, were admitted into evidence via stipulation and/or without objection.

Officer O'Brien testified that on August 18th, 2011, at approximately 7:15 p.m., his tour of duty as a Philadelphia police officer took him to 1700 Chelten Avenue in the City and County of Philadelphia. It was there that he and his partner came into contact with the defendant, Russell Carpenter. (N.T., 02-29-12, P. 11, L. 5 to 11). Officer O'Brien was the passenger in full police uniform in a marked police car. His partner, Officer McConnell, badge no. 9751, was the driver. (N.T., 02-29-12, P. 11, L. 22 to 25).

These officers were travelling westbound on the 1700 block of Chelten Avenue and made a right-hand turn onto northbound 17th Street. As they made the right-hand turn their vehicle had to swerve out of the way of a black Ford Taurus which was illegally double parked in their lane of travel on 17th Street. The officers passed this vehicle and then made a U-turn, coming back southbound towards the vehicle. They activated the lights and sirens and parked in front of that vehicle in which the defendant was a passenger. (N.T., 02-29-12, P. 12, L. 2 to 10).

Officer O'Brien testified that:

> [14] We immediately exited our vehicle.
> [15] Immediately we were at a tactical disadvantage
> [16] approaching the vehicle from the front. I
> [17] immediately notified my partner that **the defendant**
> [18] **which** *[sic]* **was seated in the passenger seat was making**
> [19] **furtive movements towards the seat area.**
> [20] We ordered the defendant several
> [21] times to show his hands, which he would not. I

6

then drew my service weapon, ordered him to show his hands, and he did not again. At this time, the black Ford Taurus put it in reverse and fled from us in reverse at a

...

high rate of speed. We immediately notified radio that we had a car pursuit and a location and where it was going. We got back in our car. At this time it was reversing down the 1700 block of Chelten which it was reversing eastbound. The defendant who was seated in the passenger seat jumped out of the car which was still moving. I immediately exited my police car in foot pursuit with the male.

(N.T., 02-29-12, P. 12, L. 14 to P. 13, L. 10). (Emphasis added.)

As he chased the defendant, Officer O'Brien testified that:

At this time the male, with his right hand was running eastbound on Chelten, threw over the fence in the grass one orange pill bottle containing an unknown substance at this time. He than *[sic]* ran back westbound with me in foot pursuit **the whole time never losing sight of him. I observed the male from about five to ten feet away drop a black gun and numerous USC.** Again, I immediately notified police radio that he had dropped it at the curb of a red Volvo and the sidewalk. **There was approximately 20 to 30 people around it.** I go there and secure the weapon. Approximately 40 yards after that I tackled the defendant, handcuffed him, again, went

...

over police radio and told them to secure the area of what he had just dropped. **I returned to the area. At this time approximately 5 to 10 people were there and nothing was able to be recovered.**

(N.T., 02-29-12, P. 13, L. 11 to P. 14, L. 6). (Emphasis added.)

Officer O'Brien described this incident as a short foot pursuit of approximately 60 yards total and specifically described the firearm as "a normal size black gun, six, seven inches, a

7

semi-automatic gun." (N.T., 02-29-12, P. 15, L. 11 to 23). The defendant also dropped a large amount of money with the gun near a red Volvo and the curb. (N.T., 02-29-12, P. 16, L. 10- 11).

The 20–30 people in the area were approximately 5 feet from where the defendant dropped the gun and the money. (N.T., 02-29-12, P. 17, L. 4 to 22). When Officer O'Brien returned within 2 minutes to where the gun and money were dropped, there were only 5-10 people there. (N.T., 02-29-12, P. 18, L. 5 to 14).

In describing his experience with identifying a firearm, Officer O'Brien testified:

Q Officer, how long were you able to see the gun?
A Mere seconds. He bladed himself. I don't know if he had it in his hand, his pockets, his waist hand [sic]. He just dropped it and kept running. I kept running after him.
Q How long have you been a Philadelphia police officer?
A Going on four years.
**Q And how many VUFA arrests have you made?**
A 50.
**Q And how many times have you recovered guns in the 50 arrests?**
A 48.
**Q So when you saw him drop the gun, how long did it take you to recognize what it was?**
A Immediately.
**Q And how did you do that?**
A I'm very familiar with a gun, Your Honor. I carry one every day. We take 80 hours of training at the Police Academy and we have to certify every year.

(N.T., 02-29-12, P. 20, L. 2 to 22). (Emphasis added.)

On cross-examination, Officer O'Brien was questioned on the arrest memo he prepared (which had been marked by the Commonwealth as C-1 and then by the defense as D-1) as follows:

Q Officer O'Brien, can you tell me anywhere in that arrest memo where it talks about he was bent over

8

or his hands were at his feet when you first encountered him and you guys parked nose to nose or five feet away, can you tell where that's reflected in this memo?

A It doesn't say.

Q Can you tell me in that memo where it says that you had to draw your service revolver with regard to this case?

A It doesn't say that, Your Honor. I typically would --

Q Just hold on. Let me ask the question. It's not in the memo, correct?

A That's correct.

Q You wrote that memo the same day, correct?

A Yes.

Q You signed off on the memo the same day,

...

correct?

A I did.

Q You actually reviewed it before you came to court today and before you testified, correct?

A Yes, sir.

Q You didn't ask the district attorney that -- you didn't tell the district attorney that you needed to make a correction or anything like that, is that a fair statement?

A That's a fair statement.

Q Could you tell me in this arrest memo where it says the car drove in reverse at approximately 25 miles an hour while you were in pursuit of it. Does it say that in the memo?

A It says the vehicle fled.

Q Does it say the vehicle fled in reverse? That's what I'm asking you about.

A No. It doesn't say that.

Q So the four or five things I just mentioned that you just testified to Judge Foglietta today, they're not in this memo, correct?

A Two things. He fled from us, I would consider that.

Q That's in there. How about did the car flee in

...

reverse, is that in there?

A Not in reverse.

Q The furtive movement, is that in there?

A No, sir.

9

Q You drawing your service revolver, is that in there?
A No, sir.
Q You telling him or giving him verbal commands to show his hands, that's not in there either, right?
A No, sir.
Q Okay. That's four things, correct, did I count right?
A You did, sir.

(N.T., 02-29-12, P. 24, L. 8 to P. 26, L. 14).

When questioned about his returning to the location of where the gun and money were dropped, Officer O'Brien stated:

Q Did you get the names of those people that were out there?
A Actually, the one was, I think he said his daughter and she said it was her dad and he dropped the money by the car so the daughter would pick it.
Q Wait, the daughter said all this?
A He said it?
Q When did he say this?
A He stated that he dropped money by the red Volvo so the daughter would pick it up.

(N.T., 02-29-12, P. 31, L. 14-23).

Defense counsel cross-examined further on the contents of the arrest memo:

Q That's not what I'm asking you. Did he say anything? Did he say, I didn't drop the gun, I didn't drop a pill bottle, did he say that to you?
A He just said I ran because I was scared and dropped the money by the red Volvo.
Q Did you ask him about the gun?
A I asked him if he had a permit to carry.
Q Did you ask him if he dropped the gun?
A Yeah.
Q And he said no?
A Of course.
Q You didn't put that in the memo that he said he didn't drop the gun.
A I know what I seen.

10

(N.T., 02-29-12, P. 32, L. 8-21).

> Q In the memo it says, and you correct me if I'm reading wrong, Quote, He through [sic] USC near a red Volvo because the owner was his daughter and knew his daughter would pick it up. That's the quote and that's the quote you signed off on in the arrest memo, right?
> A Yes.

(N.T., 02-29-12, P. 33, L. 8-13)

> Q Did you ask him about the gun?
> A I asked him if he had a license to carry.
> Q Did you put that in the memo?
> ...
> A No, I didn't put that in the memo.
> Q But he also made a statement to you that he didn't throw a gun, correct?
> A He said, no.
> Q And you didn't put that in the memo, correct?
> A Correct.

(N.T., 02-29-12, P. 33, L. 23 to P. 34, L. 7)

Upon the conclusion of Officer O'Brien's testimony, the Commonwealth moved into evidence the following exhibits by stipulation with defendant's counsel:

C-1– the Arrest Memo;

C-2– the 75-48 report prepared by Officer McConnell;

C-3– the vehicle or pedestrian investigation report prepared by Officer McConnell;

C-4 - Certificate of Non-Licensure, showing the defendant did not have a valid license to carry a firearm in the City and County of Philadelphia; and,

C-5 - the Quarter Sessions file for CP-51-CR-1301134-2006 indicating that the defendant has a past conviction making him ineligible to carry a firearm in the City and County of Philadelphia.

(N.T., 02-29-12, P. 34, L. 15 to P. 36, L. 8)

11

With these submissions admitted into evidence, the Commonwealth rested. Defendant's counsel then made a Motion for Judgment of Acquittal based upon the premise that the Commonwealth is required to show 'operability' as an essential element of the firearm charge. (N.T., 02-29-12. P. 36, L. 19-21.)

It should be noted that the Notes of Testimony contain a typographical error, as the Notes reflect that Mr. Azzarano stated in argument that he "did not come prepared to *handle* the case," (N.T., 02-29-12, P. 38, L. 25.), however, this Court recalls that he had stated that he did not come prepared to *hand in* the case, the conclusion of which is further supported by the argument that continued thereafter. *See* N.T., 02-29-12, P. 38, L. 23 to P. 39, L. 13. At a subsequent hearing, this Court did place its understanding of this comment on the record. *See* N.T., 05-15-2012, P. 108, L. 20 to P. 109, L. 6. Further, as can be gleaned from the portions of cross-examination set forth above, Mr. Azzarano clearly came prepared to handle this case on February 29, 2012.

Since Mr. Azzarano stated that he had case law to support his position in regard to the necessity of the Commonwealth to prove an "operability" requirement, this Court, in the interest of justice, adjourned the matter at that point and provided Mr. Azzarano with the opportunity to bring the case he was relying upon in support of his Motion for Judgment of Acquittal to this Court's attention. The case was continued to March 7, 2012.

### THE MARCH 7, 2012 HEARING

Argument on the 'operability' issue which was the basis for the defendant's Motion for Judgment of Acquittal resumed on March 7, 2012. Prior to the start of the proceedings, Mr. Azzarano, in an off the record discussion, conceded that he had based his argument on the premise set forth in *Commonwealth v. Layton*, 452 Pa. 495, 307 A.2d 843, 1973 Pa. LEXIS 469

12

(1973), but failed to recognize that the 'operability' requirement set forth in *Layton* had been superseded by statute, as confirmed in *Commonwealth v. Thomas*, 2009 PA Super 245, 988 A.2d 669, 2009 Pa. Super. LEXIS 4967 (Pa. Super. Ct. 2009) and *Commonwealth v. Zortman*, 611 Pa. 22, 23 A.3d 519, 2011 Pa. LEXIS 1617 (2011).

Mr. Azzarano, therefore, withdrew this position on this issue. With that, this Court denied the defendant's Motion for Judgment of Acquittal. At that point, Mr. Azzarano stated "Judge, I'm not planning on calling any witnesses. Mr. Carpenter is not going to testify in this case. With those provisors *[sic]* on the record, I would rest." (N.T., 03-07-12, P. 6, L. 2-4).

Argument was then heard from Mr. Azzarano and from the Commonwealth. Although Mr. Azzarano's closing argument was compelling, thorough and well expressed, it was not convincing, as the evidence presented by the Commonwealth was deemed credible and sufficiently met the elements of the crimes charged in order for the Commonwealth to meet its burden of proof.

Based upon the credible testimony of Officer O'Brien, the defendant was found guilty of possession of a firearm (§6105); firearms not to be carried without a license (§6106), and carrying a firearm in public in Philadelphia, (§6108). Sentencing was deferred pending completion of a pre-sentence report.

The Commonwealth also requested that the defendant's bail be revoked at that time. Said request was denied by this Court. On March 9, 2012, the Commonwealth filed a Motion for Reconsideration of this Court's decision not to revoke bail. On April 4, 2012, this Court heard argument on the Motion and ordered that bail be continued as previously set. At this hearing, the defendant was represented by new counsel, Frank M. Spina, III, Esquire.

13

A sentencing hearing was scheduled for April 24, 2012, however, in the interim, on April 19, 2012, Mr. Spina presented an oral Motion for Extraordinary Relief to this Court, argument for which was scheduled for May 15, 2012. Jonathan Altschuler, Esquire, appeared at that time on defendant's behalf. The sentencing aspect of the hearing was continued based upon the pending Motion by defendant, as well as the fact that this Court had not been provided with the pre-sentence report for its consideration.

### THE MAY 15, 2012 HEARING

On May 15, 2012, this Court heard argument on the defendant's Motion for Extraordinary Relief pursuant to Pa.R.Crim.P 704(b). This Motion was premised upon Mr. Azzarano's failure to call witnesses in the defense portion of the case at the trial of February 29, 2012, i.e., his ineffective assistance, and also upon the sufficiency of the evidence presented by the Commonwealth.

Pa.R.Crim.P 704(b) states:

> Oral Motion for Extraordinary Relief.
>
> (1) Under extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial.
>
> (2) The judge shall decide a motion for extraordinary relief before imposing sentence, and shall not delay the sentencing proceeding in order to decide it.
>
> (3) A motion for extraordinary relief shall have no effect on the preservation or waiver of issues for post-sentence consideration or appeal.

This Court granted the defendant's 704(b) Motion in order to determine whether or not, in the interest of justice, that a new trial should be granted. Defendant's counsel proffered

14

evidence that there were "several witnesses", the people that were in the area where the defendant dropped the gun and money, who would have testified at trial and who would have stated that events did not occur as testified to by Officer O'Brien. Counsel also argued that that the defendant also would have testified at the trial in his defense and, further, that Mr. Azzarano did nothing to prepare the case for trial, did no investigation, failed to contact witnesses and the like. (N.T., 05-15-12, P. 13, L. 25 to P. 21, L. 8).

Despite counsel's argument that there were "at least 6 and maybe 12 witnesses" who would have testified for the defendant (N.T., 05-15-12, P. 14, L. 6-10), at this hearing, he had only three (3) present that day, Derrick Carpenter and Carl Carpenter, the defendant's brothers, and Shanita Carpenter, his daughter. (N.T., 05-15-12, P. 19, L. 15-17). Defendant's new counsel had never previously identified any of these other alleged individual witnesses by name at any point during the post-trial proceedings, nor did he offer any proof that any of these purported 6 to 12 witnesses would have been available to testify at the February 29, 2012 trial.

Defendant's counsel also proferred the testimony of Police Officer Raymond Andrejczak, an expert ballistician with the Philadelphia Police Department. Counsel contended that his testimony would have consisted of:

> [23] ... specific
> [24] examples of situations where Philadelphia police
> [25] officers believe an item to be a firearm that they
>
> ...
>
> [1] see, but then, in fact, is not a firearm. **Actually,**
> **[2] not a situation like this one where the officer says**
> **[3] as he's running, he sees an object thrown to the**
> **[4] curb and he keeps running right past it, comes back**
> **[5] later. But he would have told you about actual**
> **[6] situations where Philadelphia police officers**
> **[7] recover items, they look at it, they inspect it,**
> **[8] they property receipt it, they make sure its not**
> **[9] loaded. They do everything if its a gun, only to**
> **[10] find out its actually not a gun.** Its a replica gun.

15

Its a starter pistol. Its some other type of non firearm. That happens all -- maybe all the time is overstating it. But that happens not infrequently. He would have given specific examples of that happening.

(N.T., 05-15-12, P. 21, L. 19 to P. 22, L. 15). [Emphasis added.]

Given the nature of the defendant's motion, this Court determined that testimony would be taken in order to rule on these issues to assure that the defendant had been given a fair trial.

At this hearing, the first witness to testify was Mr. Azzarano, defendant's trial counsel. He was directly examined by the Commonwealth's attorney. Mr. Azzarano stated that he had been an attorney for over 15 years, all of it as a criminal attorney. (N.T., 05-15-12, P. 41, L. 3-7).

In regard to his representation of the defendant and trial preparation, he stated:

... Mr. Carpenter come to my office, I believe it could have been three trial preps, but I'm going to say two. Definitely trial prep and strategy sessions.
Q. In the course of trial preps, how many, if any, witnesses did he proffer to you that you

...

investigated?
A. None. There were never witnesses mentioned to me.
Q. Did you at any time say to him that you would not need witnesses because your case is open and shut?
A. Never. I would never say that to a client. In fact, I would say the polar opposite. I would never tell their case is open and shut. In fact, what Mr. Carpenter wanted was a guarantee from me that we would win the case. And I unequivocally would not guarantee him one thing other than that I would do my best for him. I would never guarantee a client a result on any level. And that is what Mr. Carpenter wanted and that is what I would not give him.

(N.T., 05-15-12, P. 41, L. 20 to P. 42, L. 12). (Emphasis added.)

16

During cross-examination by Mr. Altschuler, Mr. Azzarano further testified that:

A. I didn't hire an investigator. **Mr. Carpenter never provided me names of witnesses potentially to help him during his time in my office.**
Q. Your defense in this case was that the Commonwealth never recovered a gun and therefore simply could not prove operability?
A. No.
Q. That wasn't your defense?
A. No.
Q. At the time of this trial, it was your belief that operability was an essential element of the case; correct?
**A. That was part of my defense, yes. That wasn't the sole defense in the case.**
Q. Your defense was definitely not to call any witnesses; correct?
**A. My defense was not to corroborate anything that the police officer said.**

(N.T., 05-15-12, P. 48, L. 7-24). (Emphasis added.)

Mr. Azzarano continued:

... He never brought any witnesses to my office. **Never told me the names of any witnesses or anything like that.**
Q. Didn't you tell him, though, the reason why you don't need witnesses because that's a defense on the law. **We don't need the witnesses, it's a defense on the law?**
**A. Absolutely not.**

(N.T., 05-15-12, P. 49, L. 6-13). (Emphasis added).

In regard to his reliance upon *Layton* at trial, Mr. Azzarano stated:

... At that point I went back and researched it and realized that the state of the law has changed. And I told Judge Foglietta that I researched it and I was wrong. Withdrew the motion for judgment of acquittal at that point. **But that didn't change the defense in the case because the defense in the case was a two prong defense. Not only on the law, but also police**

17

officer credibility.

(N.T., 05-15-12, P. 50, L. 2-10). (Emphasis added).

Still under cross-examination by defendant's counsel, Mr. Azzarano testified in a consistent manner about his conversations with the defendant during the trial preparation sessions, stating:

> A. We talked about him testifying in my office. And we discussed the upside and the many downsides of him testifying, yes.
> Q. You don't remember telling him that there is no reason or there's no need for you to bring in any witnesses to court? You don't remember telling him that?
> A. I would never have told him that.
> Q. Your defense in this case was in part based on the law of operability and in part based on credibility?
> A. Yes.
> Q. The part with operability you now concede is actually was no defense at all?
> A. What I would tell you is that at the point in time I made it, it was wrong and I corrected my mistake if that's what you're asking.

(N.T., 05-15-12, P. 57, L. 3-19). (Emphasis added).

In further support of his trial strategy regarding the firearm that was not recovered, Mr. Azzarano testified that:

> A. If a police officer wasn't able to describe a gun to the Court's satisfaction sitting as a waiver, then it would still be a viable defense. Meaning, if a police officer would get up there and just say I thought it was a gun and not describe it, color, size, shape, the way it sounded when it hit the ground, the way it sounded when it hit a roof, something along those lines, it would still be a valid defense. Because then the Court would have a
>
> problem or should have a problem, and I would be arguing to this Court that the Court should have a

18

RR21

problem finding that this particular object was, in fact, a firearm.

(N.T., 05-15-12, P. 58, L. 17 to P. 59, L. 9). (Emphasis added.)

It should be noted that Officer O'Brien had identified the firearm with particularity to this Court's satisfaction as "a normal size black gun, six, seven inches, a semi-automatic gun." *See* N.T., 02-29-12, P. 15, L. 11 to 23.

In regard to the defense calling the other officers who were involved in this incident of August 18, 2011 to testify at trial, Mr. Azzarano stated:

> A. I would always consider calling witnesses that would **not corroborate** what an initial officer says that would not back up what the initial officer said.
> In this case I didn't believe it was necessary to do that. **Strategy decision.**
> **Mr. Carpenter agreed with it.**

(N.T., 05-15-12, P. 63, L. 13-19). (Emphasis added).

> **Q ... Were you only**
> **considering the witnesses presented by the DA?**
> **A. Yes.**
> **Because there was no witnesses present *[sic]* to me**
> **by the defense. Those witnesses were never**
> **mentioned to me. So I would only be able to**
> **consider not only the one witness that testified,**
> **but the other officers who were listed in the**
> **discovery in the case. The names specifically I**
> **don't remember. There were no witnesses presented**
> **to me by Mr. Carpenter.**

(N.T., 05-15-12, P. 65, L. 1-11). (Emphasis added).

Mr. Altschuler repeatedly cross-examined Mr. Azzarano on this issue in regard to his failure to call defense witnesses, but never cross-examined him by identifying any individual witness by their specific name or with other information as to their identity or version of events. *See Commonwealth v. Hunter*, 554 A.2d 550, 557-558 (Pa. Super. 1989) (setting forth

19

requirement that a defendant, who claims that trial counsel was ineffective for not calling witnesses, provide "the names and whereabouts of these witnesses").

It was not until several hearings later than these alleged eyewitnesses were eventually identified by Mr. Altschuler.

In regard to Mr. Azzarano not calling any officers involved in the arrest as a trial witness, Mr. Altschuler asked:

> Q. Would there have been a need to then discuss
>
> with the officer what the testimony would be?
> A. Not necessarily. I probably would not want
> to key an officer in by using him to -- if I was not
> using him, obviously, to support the Commonwealth,
> I'd be using him for another purpose to bolster our
> case, I wouldn't want to tip another officer off as
> to where I may be going. So as strategy, if I
> thought that that could happen, I would never speak
> to an officer and tip my hand.

(N.T., 05-15-12, P. 65, L. 25 to P. 66, L. 9).

This line of questioning clearly addresses counsel's reasonable trial strategy and not his ineffective assistance. Mr. Azzarano had a legitimate, reasonable basis for employing this trial strategy given the nature of the charges, the fact that a firearm was not recovered, and his years of experience as a criminal attorney. Cross-examination did not sway this Court to conclude that the strategy employed in the representation of the defendant did not have a reasonable basis.

In regard to testimony as to Mr. Azzarano's failure to supply this Court with the *Layton* case at the trial on February 29, 2012, the following occurred:

> So when you said you were not prepared to
> handle the case, what you're now saying is what you
> actually said was "I'm not prepared to hand up a
> case."
> A. That's exactly what you just read, yes.
> Q. You knew you were coming to trial and you had

20

RR23

cases in mind that you intended to rely upon for your defense; correct?

A. Say that again.

Q. I'll break it down.

You knew on this day, February 29, that Mr. Carpenter was coming to court, you were his lawyer for trial?

A. Yes.

Q. You knew that a defense that you intended to bring -- actually, the defense you argued at the motion for judgment of acquittal was focused on the issue of operability?

A. Right. I can't argue anything else at a motion for judgment of acquittal. It's not a credibility termination.

Q. So you came to court knowing you were going to have to argue operability?

...

A. One of things, yes.

Q. Did you come to court with case law to support your argument?

A. I didn't bring a case, no.

Q. Did you come to court with any statutory authority to support your argument?

A. Did I present to the Court, no.

Q. I know you didn't present anything to the Court. But did you even come prepared with anything in your file, any law or anything that would support the argument you were making to the Court?

A. As I said there, I was not prepared to hand up a case to the Court, no.

Q. Did you consider yourself prepared to go to trial when you came armed with no case law to support your defense?

A. I considered myself prepared to go to trial, yes.

Q. Even though you had no case law to support your defense?

A. A lot of times instead of what you do, there is no case law –

(N.T., 05-15-12, P. 73, L. 3 to P. 74, L. 22).

It should be noted that the defendant suffered no prejudice as to Mr. Azzarano's failure to have a copy of the case with him on February 29, 2012, nor did Mr. Azzarano's reliance on

21

*Layton* result in any prejudice, as this Court adjourned the trial at that time and granted him the opportunity to bring the case that he was relying upon to the next Court listing.

The fact that *Layton* was the case that Mr. Azzarano had relied upon and subsequently became aware after the fact that it had been overturned by statute in regard to the issue of operability, is irrelevant. In the instant case, the gun was not recovered and the fact-finder can presume it to be a firearm under the law. *See Commonwealth v. Layton*, 452 Pa. 495, 307 A.2d 843 (1973), "A reasonable fact finder may, of course, infer operability from an object which looks like, feels like, sounds like <u>or</u> is like, a firearm. Such an inference would be reasonable without direct proof of operability. The inference of operability, however, cannot reasonably be made where all the parties agree that the object was not operable." *Supra* at 498, 307 A.2d at 844). It should also be pointed out that in *Layton*, the parties stipulated that the gun was inoperable.

In *Commonwealth v. Yaple*, 238 Pa.Super. 336, 357 A.2d 617 (1976), it was determined that the complainant's testimony that the defendant possessed a gun which was not introduced into evidence allowed a reasonable inference of operability. *See also Commonwealth v. Holguin*, 254 Pa.Super. 295, 385 A.2d 1346 (1978). Under the totality of the circumstances, this Court was satisfied that the defendant had discarded a "real" firearm while fleeing from police.

As for Mr. Azzarano's trial strategy in this case, his testimony clearly showed it was reasonable in light of the facts of this case and the defendant's past history. Mr. Azzarano testified as follows:

> BY MR. ALTSCHULER:
> Q. Did you see in the discovery where it referenced Mr. Carpenter's daughter?
> A. Yes.
> Q. Did you ask Mr. Carpenter if you could interview his daughter?

22

A. Did I ask him?

Q. Yes.

A. I don't recall specifically whether I asked him.

MR. ALTSCHULER: That's all I have.

- - -

REDIRECT

- - -

BY MR. RITTERMAN:

Q. You were just asked about interviewing his daughter.

Why did you not interview the defendant's daughter?

A. I can't specifically recall what the discussion was. My recollection, I haven't looked at discovery in a while, my recollection is that the police officer's testimony was that the objects were thrown in an area that they determined to be the daughter's car.

**Our defense was not focused on corroborating** *anything* **that the police officer said in the case. Meaning, I wasn't going to call the daughter nor any other potential witnesses for the sake of argument to corroborate what a police officer is going to say that there was no physical evidence recovered. No, I wasn't going to call a witness that would undermine our defense and corroborate the Commonwealth's prosecution.**

Q. What aspect of the prosecution would you corroborate?

A. Assuming for the sake of argument, number one, I didn't speak to her. But I wasn't going to corroborate what the police officer was saying. That wasn't our defense. **They were the discussions we had, not to corroborate what the police officer's allegations were.**

Q. Which specific allegation are you referring to?

A. That there were people out there, there were others out there. Why the gun disappeared. The officer gave a reasonable explanation as to why the gun may not have been there. However, I didn't want to corroborate that. That's not what our offense defense was. I don't even want to call a witness

23

and say oh yeah, by the way, the police officer was right, there was 20 or 30 people out there. Strategy decision.

(N.T., 05-15-12, P. 80, L. 16 to P. 82, L. 18). [Emphasis added.]

Given Officer O'Brien's credible testimony, this was a reasonable strategy to have been exercised at the trial and clearly was not ineffective assistance. Further, Mr. Azzarano's concerns of corroboration of testimony were legitimate, as the witnesses subsequently produced by defendant's post-trial counsel, Mr. Altschuler, did, in fact, corroborate much of Officer O'Brien's original testimony, as detailed hereinafter.

In regard to the defendant testifying on his behalf at trial, again, Mr. Azzarano's testimony clearly indicated that he weighed the pros and the cons of the defendant's testimony. Based upon Mr. Azzarano's experience, knowledge, personal knowledge and observations of the defendant, it was a sound determination, especially in light of the defendant's past, including a *crimen falsi* issue, that caused him concern.

Mr. Azzarano stated as follows:

(N.T., 05-15-12, P. 83):

Q. Counsel asked you about discussions about his testifying, and that you presented advantages and disadvantages. What advantages and disadvantages did you present?
A. Disadvantages were that Mr. Carpenter, if he got up on the stand, based on my experience and based on presenting him as a witness, would not be found to be credible witness.
Q. What lead you to that conclusion?
A. Based on my discussions with him and based upon what we talked about in my office.
Q. What was it specifically your discussions that lead you to believe that?

...

24

(N.T., 05-15-12, P. 84):

A. When Mr. Carpenter would tell the story or a story, he became very emotional in a progressive way. I didn't think that was good for him to be perceived that way nor as credible on the stand. In addition to that, it was a 6105 charge. **Crimen falsi would have come in if he were to take the stand. His prior record could impeach him. So we made a strategy decision not only on the way he would testify, but there was a decision made that it would probably best strategy based on all the facts in the case that he shouldn't take the stand.** Q. Who's ultimate decision was it? A. Ultimately, it's always the client's decision not to testify. Q. So Mr. Carpenter told you he did not want to testify?

[Emphasis added.]

...

(N.T., 05-15-12, P. 85):

A. He indicated to me that he didn't see the reason to testify as well. I can't keep him off the stand if he insists on taking the stand. It doesn't happen that way. I can advise him and he can choose to follow that advice or not follow that advice. If he chooses not to follow that advice, he gets up on the stand. **He chose to follow that advice.**

[Emphasis added.]

On re-cross-examination, Mr. Azzarano testified as follows:

Q. Prior to going to trial, part of your thought process was since the Commonwealth can't prove operability in this case no reason for Mr. Carpenter to be on the witness stand because they can't make out an essential element of their case, that was part of your thought process; correct?

25

A. I would have thought about that <u>as well as a</u> <u>lot of other aspects</u> about him to testify versus not testify.

Q. I think you mentioned as part of your strategy not to call any other witnesses. Formally in that strategy, I think you also

...

said you never actually spoke to any other potential witnesses?

**A. No other witnesses were told to me. No witnesses were told to me by Mr. Carpenter. This is the first I heard about witnesses.**

Q. So your testimony -- it's really kind of a yes or no. You said that your strategy was not to call other witnesses. **But in reaching that strategy, you never interviewed any other witnesses?**

**A. There was nobody to interview.**

(N.T., 05-15-12, P. 89, L. 14 to P. 90, L. 10) [Emphasis added].

FURTHER REDIRECT
---
BY MR. RITTERMAN:
Q. Why did you not interview the daughter?
A. It was a complete strategy decision based on my conversations with Mr. Carpenter.
Q. What, if any, agreement did you have on that?
A. Mr. Carpenter appeared to understand what I was talking about. He appeared to understand the way the case should go at that point in time and agreed to it. Incentive to defense.

(N.T., 05-15-12, P. 91, L. 2 - 12)

Upon the conclusion of Mr. Azzarano's testimony, the defendant, Russell Carpenter, took the stand and testified as follows:

(N.T., 05-15-12, P. 93):

BY MR. ALTSCHULER:
Q. You heard Mr. Azzarano testify today about his representation of you?
A. Yes.

26

RR29

Q. How many times did you meet with Mr. Azzarano in his office?

A. I believe it was twice.

Q. During those meetings, did you ever discuss with Mr. Azzarano the fact that you knew of eyewitnesss to this case?

A. Yes, sir.

Q. How many times in person did you tell Mr. Azzarano that fact?

A. I believe it was twice in his office and once before court.

...

(N.T., 05-15-12, P. 94):

Q. How many witnesses did you tell him you were *aware* of?

A. I told him it happened in front of a playground full of people. And in front of the playground there's an apartment building and I was raised in that neighborhood. I told him, my exact version was I can fill this courtroom up with witnesses, how many do you want? And he told me we don't need that.

Q. Why did he tell you he didn't need any witnesses?

A. Mr. Azzarano just said it was an open and shut gun. No gun, no case.

Q. How many times did he say that to you, no gun, no case?

A. I believe it was about two or three times. I believe two or three times because we spoke in his office twice. I believe once before court, it was like a little prep. He didn't agree with that, with

(N.T., 05-15-12, P. 95):

me testifying or bringing my witnesses.

Q. He told you he didn't think your witnesses should testify?

A. No. He told me exactly that. He said I don't think they should testify.

Q. Because it was an open and shut case?

A. Because it's an open and shut case. I specifically stated that it was in front of

27

a playground August 18, on a hot and sunny day when I got off work. Its an apartment building, 100-unit apartment building right across the street where everybody comes outside. I know I could have gotten witnesses.

...

**Did you have any specific people that you had already identified as witnesses that you knew to be available?**
A. Yes.

(N.T., 05-15-12, P. 96):

Q. How many people?
A. Ten. About ten to 20.
Q. Did you try to give that list to Mr. Azzarano?
A. I suggested it. I suggested it, and he told me that wasn't a good strategy decision.
Q. Did you tell Mr. Azzarano that the police reports were not true?
A. Yes, sir.
Q. Did you -- strike that.
Did Mr. Azzarano ever give you the opportunity to when you were in court at trial to testify and tell your version of events?
A. No.
Q. Between February 29 when Mr. Azzarano made the arguments about operability. And March 7 when your case continued, did Mr. Azzarano at that point ever ask you about your witnesses?
A. No.
Q. Did you ever tell him about your witnesses during that time?
A. Yes.
I kept stating that since the day that I met him through John Della Rocca who I also told about the witnesses at the playground.

(N.T., 05-15-12, P. 97):

Q. You also told Mr. Della Rocca about the witnesses?
A. Yes, ...

28

Despite opportunity to do so, the defendant, again never mentions a single person by name and simply, vaguely and not credibly re-iterated claims of numerous witnesses who he believed he "*could have gotten*" to testify on his behalf.

This vagueness on the identity of the witnesses was compounded during cross-examination of the defendant and it shed additional light on exactly what he had told Mr. Azzarano prior to the trial, which was essentially nothing of particular detail that would leave one to question Mr. Azzarano's preparedness, trial strategy or effectiveness in defending the charges against the defendant.

(N.T., 05-15-12, P. 97):

Q. You gave him specific names of witnesses?
A. No.
I suggested it when we were meeting.
Mr. Azzarano was telling me on his strategy decision
that that wasn't a good strategy decision.
Q. Once he told you that, you never said the
names of witnesses?
A. I kept suggesting it every time we met.
Every single meeting that we had, I kept suggesting
like Jeff, you don't think this is a good strategy
because it did happen in front of a playground full
of people.
Q. When you say you "suggested it", did you

(N.T., 05-15-12, P. 98):

suggest the name of a specific witness, was part of
your suggestion you should call Mary?
A. No.
I just said Jeff, I have 100 witnesses I can
bring. I think that would be our best strategy.
Q. Is this a witness that you've spoken to prior
to telling Jeff that?
A. No.
Q. You just theoretically assume that out there
there was someone who saw this and would testify to
your version of events?
A. I was arrested on the case. And when I got

29

out, I had a million people come up to me and say
they saw everything that happened. It was a hot
sunny day, everyone was out.

...

(N.T., 05-15-12, P. 99):

...

Q. How many people came up to you?
A. When I walked back the neighborhood, **I tried**
**to go around to see who saw what happened.** I knew
the fact -- I knew I didn't have a gun. When I came
to court, that's the way I wanted to prepare with
witnesses.

...

(N.T., 05-15-12, P. 100):

Q. Did you tell Azzarano you would not accept a
trial without those witnesses?
A. Once he gave me his version of the strategy,
it was like no gun, no case. I mean, that's what I
went with.
Q. So once he told you that, you accepted that?
A. Yes.
Q. But then you said on the next occasion you
told him you wanted witnesses again, didn't you?
A. No.
I always brought up the fact where this
happened that -- I made that clear to him where it
happened, what the scene looked like. It was lot of
people outside. That's what I talked to him about.
Q. Let me ask the question again.
After the first time you said I want
witnesses, he said we don't need the witnesses. You
met with him again and you again said to him I want
witnesses, didn't you?
A. Yes.
But he was very firm on his standing. He
said "Russ, listen, we don't" -- he didn't want my

(N.T., 05-15-12, P. 101):

**witnesses to conflict what was going on in the**
**courtroom. And he didn't want me to get up and**
**testify because of my prior history.**
Q. After the police officer testified, you met

30

with Mr. Azzarano and again said you wanted witnesses; right?

A. No.

Q. Didn't you testify to that on direct?

A. Excuse me?

Q. Didn't you testify on direct that in between the -- don't look to your lawyer. In between the witness testifying and the listing where the case law was going to be argued, you once again asked for witnesses, didn't you testify on direct that you said that?

A. You said I asked my witnesses?

**Q. You asked Mr. Azzarano to call your witnesses?**

A. No.

Q. You were out on bail prior to trial?

A. Yes.

Q. Did you bring your daughter with you to your lawyer's office?

A. No. I went down straight from work.

**Q. Did you call your daughter and tell her to**

(N.T., 05-15-12, P. 102):

**meet you there?**

A. No.

Q. Did you tell any of the so-called million people to meet with your lawyer?

A. I had talked to them and they were prepared to come. But since my lawyer suggested that we don't proceed in that manner, I didn't proceed in that manner.

**Q. Did you bring them to court just to observe the trial?**

A. No.

...

(N.T., 05-15-12, P. 102):

Q. Did you tell him what those witnesses would have said?

A. He never asked me.

Q. You said I have witnesses but you didn't give their names or what they would have said?

A. As soon as I said we had witnesses, it was "No, no, Russ, this is what we need to focus on."

31

[10] So that's what we focused on.

[Emphasis added.]

Despite being questioned on direct and cross-examination about the existence of witnesses, neither the defendant, nor his post-trial counsel, ever provided the specific name of even one witness until very late in the post-trial proceedings. Defendant even testified that he never provided his former counsel with any specifics in regard to these witnesses. He went back to the area to "try to find" witnesses. He failed to testify that he was successful in that pursuit.

This led this Court to reasonably conclude that there were no witnesses who could have been specifically, or even generally, identified by the defendant to Mr. Azzarano that would have assisted in the defense of these charges. This Court did not believe the defendant's testimony in this regard as it seemed rehearsed and was not credible. If the defendant didn't know the identity of the witnesses, it is reasonable and logical to conclude that his attorney could not have known of their identity in order to perform pre-trial investigation. The defendant's position in this regard is illogical.

Additionally, the defendant's testimony regarding the assertions by Mr. Azzarano as to the case being 'open and shut' were also not credible and were not believed by this Court. This defendant lacked any credibility in regard to his assertions of Mr. Azzarano's ineffectiveness. Further, this testimony of the case being "open and shut" per the advice of Mr. Azzarano was later contradicted by the defendant's own brother who stated that the defendant told him it was "open and shut" per his attorney at the preliminary hearing being held at the 35th police district which took place before Mr. Azzarano had entered his appearance and the defendant was represented at that time by the Defender's Association. *See* testimony of Derrick Carpenter, N.T., 08-24-2013, P. 84, L. 14 – 25.

32

After hearing argument from both counsel, this Court weighed the testimony of Mr. Azzarano and that of the defendant and determined that Mr. Azzarano's testimony was more credible than that of the defendant and, therefore, denied the defendant's Motion for Extraordinary relief.

Sentencing of the defendant then took place. Since there are no issues raised on appeal in regard to the sentence imposed by this Court, the details are not necessary to include in this opinion, but, should the appellate court deem it necessary, this Court incorporates its reasoning in imposing the sentence set forth at N.T., 05-15-2012, P. 135, L. 14 to P. 136, L. 7.

On May 17, 2012, the defendant filed a Motion for Post-Trial Relief. A hearing on this motion was held on August 22, 2012.

### THE AUGUST 22, 2012 HEARING

At the August 22, 2012 hearing, argument was heard from both defendant's counsel and from the Commonwealth. Defendant's counsel was permitted to present the testimony of two (2) witnesses, Mr. Azzarano (again) and a ballistics expert, Philadelphia Police Officer Raymond Andrejczak.

The purpose of this hearing was to provide evidence for this Court to consider as it related to the allegations of Mr. Azzarano's trial ineffectiveness. After hearing the testimony of both witnesses, this Court, in a review of the entirety of the testimony taken post-trial, concluded that the underlying outcome would not have been different had Officer Andrejcak or any other ballistics expert testified at the original trial on defendant's behalf.

Once again, Mr. Azzarano testified credibly and the testimony of Officer Andrejzak was deemed irrelevant, as it addressed his expertise in examining guns that he was actually able to

33

examine in order to determine if they were firearms under the law as it relates to operability. Defendant's counsel's line of questioning in this instance was unpersuasive, as the significant factor in this instance was that a gun was not recovered and therefore, Officer Andrejzak's testimony would be of no importance since it couldn't be examined, however, in order to once again give the defendant every opportunity to a "fair trial", this Court permitted him to proceed with this motion and conducted an evidentiary hearing.

Defendant's counsel proceeded with his examination of Mr. Azzarano by again questioning his trial strategy related to the cross-examination of Officer O'Brien in regard to whether the weapon he saw discarded was a "real" gun. This testimony was as follows:

Q. It was -- as I recall from your prior testimony, your strategy in this case was twofold. One aspect of your strategy was that if a firearm was not recovered, the Commonwealth would not be able to prove that it was in fact a firearm under the Crimes Code; is that correct?
A. They would have not -- that's part of it. They would have not been able to prove an operability.
Q. Correct. Meaning it would not be considered a firearm under the Crimes Code? That was part of your strategy; is that right?
A. That was part of the strategy, yes.
Q. That other part of your strategy was to attack the credibility of the police officer's story that this gun was discarded in front of a big crowd of people but he simply chose to leave it there and continue chasing Mr. Carpenter? The second part of your strategy was to attack the credibility of the police officer's testimony; is that

correct?
A. The second part of the strategy was to the credibility of the police officer, yes. That this police officer was fabricating, correct.
Q. Now, do you agree that at the trial you never asked the police officer whether he believed the item that he saw hit the ground was the real firearm -- a real gun?
A. I don't know whether I asked him that or not. I haven't review the trial transcript.
**Q. You agree with me that would have been an important**

34

question to ask the police officer since he was the only witness in the whole case -- about the only witness in the whole case? You agree it would have been important to get from his perspective whether this was actually firearm?

A. Well, I guess it would depend on your strategy. I mean, if part of the defense was to concede that some sort of object was thrown then maybe it would have been a strategic decision to ask that question. But part of defense was not to concede that anything was thrown, quite frankly, and I discussed that with Mr. Carpenter with regards to, "Do we concede all part or none of it," in so many words. So depending on the strategy, it could be an important question but that was not part of the strategy. We weren't conceding anything that the officer was saying.

Q. Why did you argue operability at all if it's your position that there was no gun ever involved in this case?

A. I would always argue operability at the stage I argued it at, which I believe the first time I argued it was the motion for judgment of acquittal stage in front of the Court. I also incorporated that argument as well at the reasonable doubt stage.

(N.T., 08-22-2012, P. 35, L. 9 to P. 37, L. 6) (Emphasis added.)

Counsel repeatedly questioned Mr. Azzarano on his trial strategy, but nothing elicited from him shows how it prejudiced the defendant to the extent it would have changed the outcome of the trial. Mr. Azzarano's approach to defending this case was reasonable and was explicitly set forth in the following line of questioning:

N.T., 08-22-2012, P. 37:

Q. Correct. If the Court were to find the officer credible, which was a distinct possibility, why didn't you ask the officer whether he was certain if that gun was real?

A. Well, there is a lot of possibilities. I mean, the Court could have found the officer not credible and I wouldn't have had to ask that question. It certainly is a possibility. I don't know whether the question was asked or not because like I said, I haven't reviewed the trial transcripts. However, it was the strategy decision if I didn't ask it because it was an all or nothing defense. We

35

**[25] were not conceding anything that the loan [sic] officer said.**

N.T., 08-22-2012, P. 38:

...

Q. ... What would the strategic decision have been to not ask the officer about whether the gun was real or not? What would the harm have been?

A. As I understand your question, sitting as a fact finder, the harm would have been that this Court could have assumed I was arguing out of both sides of my mouth. I did not want to stand up in front of this Honorable Court and say, "Judge, if you believe something was thrown, how could they prove it was a gun? And, Judge, here's the other thing, I'm not conceding anything was thrown." That wasn't the strategy in this case. I didn't want to argue in front of the Court out of both sides of my mouth.

Q. Wasn't that exactly what you did at your motion for judgment of acquittal when you argued that the element of the crime is the operability of a firearm?

A. No, it's not.

Q. Mr. Azzarano, if the Court were to believe your

N.T., 08-22-2012, P. 39

theory that there was no such gun, why would operability matter?

A. Because I have a legal duty to my client to present every possible defense and if the Commonwealth didn't meet their standards with regards to the legal element of the crime, as opposed to credibility, because as you know -- well, I'm assuming you know -- as you very well know, credibility is not an issue at the motion for judgment of acquittal stage. I can't argue to this Court with a straight face that this Court could take into consideration the officer's credibility.

Every inference at that particular point at the motion for judgment of acquittal goes towards the Commonwealth. Same standards at the preliminary hearing, essentially.

Q. Now, if the officer had testified, notwithstanding your theory, that I don't know whether it was a real gun or not, would that have bolstered your argument at the judgment

36

of acquittal stage?

A. If the officer had testified that it was not a real gun.

Q. That he didn't know it one way or the other?

A. I guess it would have.

Q. Okay. But you didn't ask the officer that question?

N.T., 08-22-2012, P. 40

A. No. In my experience, the officer wasn't going to testify that he didn't believe it was a real gun.

Q. Not whether he believed. Whether he knew?

A. The officer was not going to testify that he wasn't sure this was a real gun.

Q. That's what you believe?

A. That's what I believe from doing this for 15 years.

Defendant's counsel continued to question Mr. Azzarano on his trial strategy over the next several pages of testimony, most of which was essentially a rehashing of the prior testimony, none of which had a negative effect upon Mr. Azzarano's credibility, nor provided this Court with any evidence which would indicate he was ineffective in his defense of the charges against the defendant.

The defendant next presented the testimony of Police Officer Raymond Andrejczak of the Firearms Identification Unit (FIU). Officer Andrejczak has been an officer for 19 years and assigned to the FIU for the last 5 ½ years. (N.T., 08-22-2012, P. 85, L. 5-14).

In regard to identifying a weapon that he has the opportunity to actually examine, he testified as follows:

Q. In your experience, are you able to look at an idea [sic] that appears to be a semiautomatic handgun by simply looking at it and not touching it and determine whether or not it's a firearm?

A. That would depend on several different factors.

Q. Who [sic] type of factors?

A. One is how close I am to the supposed firearm.

37

Prior experience with certain types of mock firearms or replica firearms, absence or presence of the warrant safety tip, which is common with a lot of the replica types and the air soft types. Based on my training and my experience, at

first glance, most of the time I could pick them off pretty good.
Q. You can?
A. Yes.

(N.T., 08-22-2012, P. 86, L. 15 to P. 87, L. 4)

Later Officer Andrejczak stated:

Q. Officer, do you believe that a Philadelphia police who was engaged in flight after a suspect who observes an item being thrown or discarded to the ground and continues running without stopping to recover it, do you believe that

anybody could have concluded definitively whether that item was a firearm or not?
A. I can't state yes or no on that. Based on -- that's anybody's guess whether they could say whether it was or not.
Q. Well, would you be able to conclude whether something is a firearm with all your experience if you saw it discarded while in the case and never saw it again?
A. Again, there is many factors that could affect that whole scene.
Q. Would that include, for example, how good of a look of the item that you got?
A. How far away I was when it was thrown, the daytime, nighttime, streetlighting, any kind of the debris on the ground. Like I said, there are too many factors that could affect that whole -- unless you actually saw it and know that you saw it -- I mean, you don't have to be an expert to say that, "Yes, I saw something that appeared to be a firearm."
Q. Something that appeared to be a firearm?
A. Things aren't always as they seem.
Q. Right. And that's what we saw from D-1 and D-2, correct?

(N.T., 08-22-2012, P. 89, L. 22 to P. 90, L. 22)

38

Exhibits D-1 and D-2 refer to a property receipt and report prepared by this officer in regard to a weapon that appeared to be a firearm, ***but upon examination*** was determined to be a non-firing replica. Counsel's point on this line of questioning addresses an instance where an item appears to be a firearm but is not by statute because it was determined, after examination, to be inoperable.

The relevance of this testimony to this matter by Mr. Altschuler was wholly misplaced, as the initial misidentification of this replica weapon referred to in D-1 and D-2 was not made by Officer O'Brien, but by other officers not involved in this case. Had Officer O'Brien been the officer who had previously misidentified a firearm in another instance, then Officer Andrejczak's testimony may possibly have had an effect on the credibility of his trial testimony as to the object discarded by the defendant.

The case was adjourned and re-listed for its continuation on August 24, 2012.


## THE AUGUST 24, 2012 HEARING

The matter resumed on August 24, 2012. This Court heard testimony from five (5) witnesses, one for the Commonwealth and the remainder for the defendant.

Defendant first called Gregory Morgan to testify. Mr. Morgan has been a friend of the defendant for over 35 years. (N.T., 08-24-2012, P. 8, L. 10-16). He also works with the defendant. (N.T., 08-24-2012, P. 10, L. 6-8).

Mr. Morgan stated that on August 18, 2011, he was with a group of several people, including the defendant, sitting and talking around 1700 Chelten Avenue. (N.T., 08-24-2012, P. 8, L. 17 to P. 9, L10).

In regard to the events leading up to the defendant's arrest, Mr. Morgan stated:

39

Q. Now, at some point did Russell leave the playground area where you were?

A. Yes.

Q. Where did he go?

A. Across Chelten Avenue, up 17th Street, and got in a car.

Q. Could you describe the car that he got into?

A. It was a small car. I don't know if it was a Camry or an Altima, but it was small. And it was dark, like black.

Q. Four-door? A small four-door car?

A. Yes.

Q. Okay. Do you have any idea who was in that car?

A. No, I don't.

Q. How long was Russell gone, if you paid attention to that?

A. I'd say not even 5 minutes, about that.

THE COURT: How long?

THE WITNESS: For a few minutes, probably about 5 minutes, because he had to walk up to the car.

BY MR. ALTSCHULER:

Q. Did anything then draw your attention to the area where this car was?

A. The police.

Q. Okay. What happened with the police?

A. They were standing out -- they was out front of the car with their guns out moving towards the car (indicating).

(N.T., 08-24-2012, P. 10, L. 19 to P. 11., L. 24)

Q. What happened next?

A. The car went in reverse and came down 17th Street towards -- in reverse towards Chelten Avenue and turned onto Chelten Avenue and Russell jumped out.

Q. Was the car still moving or stopped?

A. Yes, it was still moving.

Q. When Russell jumped out?

A. When he jumped out, yes.

Q. So what happened when he jumped out?

A. He jumped and stumbled or whatever. And the cop was right there. One of the cops that was

40

right there told him don't move, and he did like this (indicating).

Q. Indicating for the record he had his hands up?

A. Yes.

(N.T., P. 12, L. 9-24).

A. He was taken over to -- this was in the middle of the street. So he was taken over to the apartment, onto the pavement on the side of the apartment building and wrestled to the ground.

Q. Okay.

A. And I crossed from over at the playground side to where Wagner Public School is, which is directly across from the apartment building, where they subdued him to the ground or arrested him there. And I stood over there like this (indicating).

Q. Just stood with your hands crossed?

A. Yes, I stood with my hands crossed and watched the whole thing.

Q. Okay. You were not involved in anything between Russell and the police; you were just observing?

A. Not at all.

Q. You were just observing?

A. I observed the whole thing, yes.

(N.T., P. 13, L. 2-20).

It was stipulated that the witness was approximately 25 feet from this activity.

Q. Did you ever see Mr. Carpenter run from the police?

A. No.

**Q. Did you see him discard any items?**

**A. No.**

Q. Now, you described the playground as fairly crowded?

A. Yes.

Q. Did you see anybody from the playground go over and recover any evidence or anything?

A. No, I didn't see nobody recover anything.

Q. Okay. Did you ever lose sight of Mr. Carpenter from when he jumped out of this black car until he was arrested?

41

A. No.

As to this witness' availability to appear at trial, he testified:

Q. Now, after this incident when Russell was arrested and then at some point he was released. Is that right?
A. Yes.
Q. Did you talk to him about the incident?
A. Yes.
Q. Did you discuss with him your availability or unavailability to be a witness for him?

A. Yes.
Q. What did you tell him?
A. I told him I would come if he needed me.
Q. And in February of this year, February 29th of 2012, if you had been subpoenaed as a witness, would you have come to court?
A. Yes.
Q. Were you ever subpoenaed as a witness?
A. No.
Q. Were you ever interviewed before me by any other attorneys or investigators?
A. No.
Q. Were you prepared to cooperate and testify at trial on behalf of Russell?
A. Yes.
Q. Did you ever ask Russell why it was that you were not being either interviewed by an attorney or subpoenaed to testify in court?
A. When he told me he didn't need me, I asked him why.

(N.T., 08-24-2012, P. 15, L. 18 to P. 16, L. 20).

Q. Well, did you come to court?
A. In February?
Q. Yes.
A. No.
Q. Why?
A. I was told I wasn't needed.
Q. And what were you told as to why you didn't have to come to court?
A. Russell told me that it was an open and shut case.

42

(N.T., 08-24-2012, P. 17, L. 3-12).

Q. What was the conversation you had with Mr.
Carpenter as to why you were or were not going to come
to court?
A. Why I didn't come?
Q. Right.
A. I told you I was willing to come. I told
you I didn't come because he said I wasn't needed.
Q. Okay. And did you have a conversation with
Russell as to why you weren't needed?
A. Yes.

(N.T., 08-24-2012, P. 20, L. 12-23).

. . .

Q. He talked to his lawyer is what he --
A. Is what he told me. I don't know what he
said to him. I know what he told me.

(N.T., 08-24-2012, P. 21, L. 3 - 5).

This witness only knows what the defendant told him. He does not know what Mr. Azzarano told the defendant about the need or lack thereof for witnesses. When comparing this testimony to the testimony of Mr. Azzarano , Mr. Azzarano was, again, more credible in regard to never being told the identity of specific witnesses.

Cross-examination of this witness regarding the August 18, 2011 arrest by the Commonwealth elicited further details:

Q. Now, when Russell gets into this car,
do you see the car pull up first?
A. Did it pull up?
Q. Yeah.
A. Well, I didn't pay attention to it until he
walked over there. He answered his phone and then
walked over there.
Q. He answered his phone first?
A. Yes.
Q. So he gets into the car and 5 minutes later
the police show up, right, with guns?

43

A. Well, actually you see them -- from where we were standing at, you could see the police, like, the cop car, because it actually passed him on 17th Street. It passed him and came down and turned onto Chelten Avenue, went past Smedley Street, made another U-turn, came back, turned onto 17th Street, passed

(N.T., 08-24-2012, P. 24, L. 9 - 25).

them. And that's when they jumped out and were standing in front of them.

...

Q. Now, you say the police wrestled him to the ground. Is that correct?

A. Yes.

Q. And does that mean there was, like, a wrestling match going on?

A. No, meaning he was trying to make him lay on the ground.

Q. Okay.

A. He was already on his knees.

Q. He was on his knees?

A. He was trying to make him lay on the ground. And he told them he wasn't laying on the ground because he had a bullet in his neck were the exact words.

Q. You heard him say that?

A. Yes.

(N.T., 08-24-2012, P. 25, L. 1 - 20).

...

Q. All right. Let's backtrack here. The police are coming at him with guns and then he gets on his knees?

A. No. He had his hands up. So they took him from out in the middle of the street over to the pavement on the other side across from the playground, which is an apartment building.

Q. Okay.

A. And right there on 17th Street is a patch of dirt, like, where grass is supposed to be. There's no grass. But that's where they were at. There was three cops right there. So they told him to get down on the ground. He got down

44

on his knees. And one of the officers was trying to wrestle him to the ground. And he said he wasn't getting all the way on the ground because he had a bullet in his neck.

(N.T., 08-24-2012, P. 26, L. 23 to P. 27, L. 14).

...

Q. So what time did these other cops show up?
A. During the mix of all this - and this is no lie - it seemed like the whole 35th was out there by then, because some cops went to chase the car. Some cops stayed there and had the dogs and went up in the playground and everything else.

(N.T., 08-24-2012, P. 28, L. 20 - 25).

This witness' testimony not only corroborated Officer O'Brien's trial testimony, but also the accuracy of his arrest memo, C-1, as it contains information related to a K-9 unit being utilized to search for the discarded items. This witness did nothing to aid in the defense of the defendant, but only compounded the strength of the Commonwealth's evidence and reinforced the credibility and accuracy of Officer O'Brien's trial testimony. Mr. Azzarano could not be faulted for failing to call this witness.

In regard to what this witness knew in regard to the reason his friend was being arrested, he stated:

Q. Did it seem to you that they were arresting him for no reason?
A. I don't know what happened. I'm watching to see what's going on. People get arrested every day. I don't know what's going on.

(N.T., 08-24-2012, P. 34, L. 11 - 15).

...

Q. And when you talked to him a couple days later, did he tell you what the case was about?

45

RR48

A. He said they charged him with a gun.

Q. Okay. And you said to him, well, I didn't see a gun. Right?

A. Probably. If not, something to that effect.

Q. So did you then go to the police and say I was out there; he didn't have a gun?

A. No.

Q. Did you go to a lawyer and say, hey, I saw this; this didn't happen?

A. No.

Q. Did you find out who his lawyer was?

A. No.

Q. Did you talk to the other witnesses about the charge once you found out what it was?

A. Not that I can recall.

Q. And did you ask the defendant when his trial was?

A. Not that I can recall.

Q. Did you want to see what happened with your friend of 35 years at trial?

A. I figured I was going to. I'm with him -- I was with him almost every day, so he was going to

. . .

tell me if he needed me. And that's what was said; he didn't need me, so I didn't go. Would I just sit in a courtroom to just go? No.

Q. Well, didn't you want to see if he would get convicted or not? Didn't you want to see what would happen to him?

A. If I wasn't going to partake, you know, to give my side of what's going on, just to sit there, no.

(N.T., 08-24-2012, P. 40, L. 1 to P. 41, L. 8).

On re-direct, this witness stated:

Q. Did you tell Russell that you were available to speak with his attorney if needed?

A. Well, I guess he would assume that. But if he asked me would I be a witness, I would assume that would have been taken.

46

RR49

This line of questioning clearly shows that there was nothing definitive in regard to conversations between this witness and the defendant and are all just basic assumptions, on his part. Despite a nearly lifelong friendship with the defendant, this witness appears to not have interacted to any degree with the defendant on this matter. Even if this witness was willing to testify, it is clear that the defendant failed to share this specific information with Mr. Azzarano.

The defendant then called his brother Derrick Carpenter as a witness. Under direct examination by Mr. Altschuler, he testified:

N.T., 08-24-2012, P. 58:

before your brother got arrested do you remember seeing your brother?

A. I remember seeing my brother cross the street from the playground as I was walking down the street. And I just yelled at him like we normally do.

Q. Okay. What was the next time you noticed your brother?

A. Jumping out the car.

Q. So did you ever see your brother get into a car?

A. No, sir.

Q. But you saw him getting out of a car?

A. Yes, sir.

Q. Could you describe the car that you saw him getting out of? I don't need the make and model, but is it a two-door car? Four-door car? Convertible? Dark color? Light color? That type of description?

A. A four-door black car.

Q. Okay. What drew your attention to this four-door black car?

A. I just happened to look up from -- once I got to the playground and started having a conversation, I just happened to look down 17th Street. And the cop car that just passed me was now turned on

N.T., 08-24-2012, P. 59:

17th Street blocking the black car, and there was two officers with their guns out.

47

Q. They were on foot or they were in a vehicle?
A. With their guns out?
Q. Yes.
A. They was on foot at each side of the door of the black car.
Q. Okay. What did you see next?
A. What I saw next was like -- somebody say, yo, I think Chink is in that car. That's Russell. And I said, yo, I hope they don't shoot in that car because my brother in that car.
And next thing I know, the car went in reverse. They officers re-holstered their guns. They start trotting back to their vehicle. When the car came to the 17th and Chelten corner, which was only maybe about 10 feet, the door came open. He came out. His foot was caught --
Q. Who is he?
A. Russell.
The door came open at the stop. You could hear the driver throwing it in drive now. And his door came open, and he came out, and his foot was caught, and you could tell he was jumping out.

Again, another defense witness corroborated Officer O'Brien's trial testimony and also provided details on facts which he was cross-examined not contained within Police Officer O'Brien's arrest memo, again corroborating the veracity of the officer's trial testimony. This witness clearly would have defeated Mr. Azzarano's trial strategy of conceding nothing and discrediting the officer on his own words. This witness' testimony continued:

N.T., 08-24-2012, P. 60:

A. The car took off towards Ogonz going west on Chelten.
Q. And what did the police officers do at this point?
A. The police officers immediately came to the corner. They both jumped out. They told him get down to the ground, get on the ground. He had his hands up. And he said, man, I can't get on the ground; I got a bullet in my neck.

48

And the officer jumped on top of him
and said, I don't care about a bullet in your neck.
And he just pushed him down on the ground and put his
knee in his neck after he just told him that.

...

N.T., 08-24-2012, P. 61:

Q. Okay. How far away were you from the
corner where your brother was taken to the ground?
A. From here to that door.
Q. Which door?
A. The door of the courtroom.
Q. So roughly from here to the back door of
the courtroom?
A. From me to the courtroom.
MR. ALTSCHULER: And just for the
record, we'll agree it's roughly 35 feet.

...

N.T., 08-24-2012, P. 62:

[The police searched] his pockets and stuff. He didn't
have nothing on him. He put him in the car. And then
the other cops just started searching the whole area
and just told us to move; this is a crime scene now;
this, that, and the third. That's when I moved.
Q. Did you see your brother throw anything?
A. No. I seen him lose his cell phone when he
came out the car.
Q. Okay.
A. That was the only thing I saw.
Q. Did you see him throw any money?
A. No.
Q. Did you see him throw any amber-colored
pill bottles?
A. No.
Q. Did you see him throw any kind of guns?
A. No.
Q. Did you see anybody from the playground or
the street or that area run over and pick up any money?
A. No, sir.
Q. Or any pill bottles?
A. No, sir.
Q. Or any gun-shaped items?

49

A. No, sir.

This witness did not see the defendant throw anything, in particular money, once the defendant emerged from the car, despite the defendant himself informing the police that he threw money near a car because he knew his daughter would pick it up. One must question why the defendant would flee from police and later admit only to discarding a large amount of money near a crowd of people without discarding something else, as it is not unlawful or illegal to possess currency.

As for this witness' availability to testify at trial, he stated:

N.T., 08-24-2012, P. 65:

Q. Did he ever ask you about your willingness to be a witness for him?
A. Yes, he asked. And I told him -- I told him that, yo, we need to get the whole neighborhood down there. And in return Russell said, well, I spoke to the lawyer and everything; they don't have no gun; and he told me I don't need no witnesses.
Q. How many times did you discuss this case with Russell?
A. Many times.
Q. Okay. Were you available to come to court in February of this year as a witness?
A. Yes, sir.
Q. If you were subpoenaed, would you have come to court?
A. Yes, sir.
Q. Were you prepared to cooperate with your

N.T., 08-24-2012, P. 66:

brother and his lawyer?
A. Yes, sir.
Q. And you were prepared to testify in this case?
A. Yes.

50

Despite this witness' willingness and availability to testify, it still does not affirm that Mr.

Azzarano knew or should have known of his existence, nor does his testimony aid in the defense

of the charges against the defendant.

On cross-examination by the Commonwealth, this witness testified:

N.T., 08-24-2012, P. 71:

Q. How do they put him on the ground?
A. They wrestled him. They forced him down onto the ground. He went to the knees, and then they pushed his face on the ground.

Again the use of the word "wrestled" was employed by all three witnesses who testified

on this day and who were sequestered during the trial.

On the issue of the defendant dropping his cellphone, the following cross-examination

testimony was taken:

N.T., 08-24-2012, P. 72:

You said that you saw a cell phone fall. Correct?
A. Yes, sir.
Q. Did anyone pick it up?
A. I have no idea. Nobody went near the cops wrestling somebody down on the ground. I have no idea. I was more worried about my brother than the cell phone.
Q. So you kept your attention right on your brother?
A. Yes, sir. I even pulled my phone out and said, make sure they don't hurt my brother.

N.T., 08-24-2012, P. 73:

Q. So someone else could have picked up the phone because you weren't looking; you were looking at your brother?
A. I'm looking at my brother. I have no idea.

51

He does not know if anyone picked up his brother's cellphone since he was focused on the actual arrest. Since he was focused on the arrest, then he was not aware of other events going on around him. He was so concerned about his brother's well-being that he took his own cellphone out, presumably to preserve on video or by photograph the defendant's arrest. This witness would not have been focused on the activities of these other 30 or so people in the area of the playground, many of whom dispersed shortly thereafter. This Court concluded that some person or persons in that crowd took the pill bottle, money and gun before the police were able to return to the area of the red Volvo and left the scene before the search took place.

The most interesting testimony from this witness was elicited in regard to questions about the events occurring shortly after the defendant's arrest and leading up to the preliminary hearing. This witness stated:

N.T., 08-24-2012, P. 76:

**When did you find out the reason for his arrest?**
A. I found out the reason when I talked to my mother.
Q. And when was that?
A. When he was able to call home. **The next day probably, for bail.**
Q. And you found out that he was arrested for having a gun. Right?
A. No. I found out he was accused of having a gun.
Q. Okay. And you knew that that was

N.T., 08-24-2012, P. 77:

incorrect?
A. Yes, I did.
**Q. So did you go to court the next day?**
**A. No. My brother didn't want anybody at court.**
Q. Did you talk to the police and tell them my brother didn't have a gun?

52

A. No. My brother was given orders that he don't need nobody for this case.

Q. And he did this the next day?

A. He did this the next day, the trial day, and all the other days.

Q. Did you talk to other people who were at the scene about the case?

A. Yup, sure did.

Q. And did you talk to Gregory Morgan?

A. Yup, we've been talking for the last year about the case.

N.T., 08-24-2012, P. 78:

Q. So when was the first time you talked with Gregory Morgan about the case?

A. I don't know. I can't recall.

Q. Approximately within a week of the arrest?

A. Maybe.

Q. And when was the last time you talked with him about this case?

A. About a week ago.

Q. Did you talk to him about it today?

A. Did I talk to him about today that's coming?

Q. No, I'm sorry. Today did you talk to Gregory Morgan?

A. No.

Q. When you talked to Gregory Morgan a week ago, what were you talking about with him?

A. That we're going to get our day in court; that's a fair judge.

Q. Right. And that means you're going to talk about what you actually saw at the scene?

N.T., 08-24-2012, P. 79:

A. Exactly.

Q. That you saw the defendant just get arrested for no reason?

A. No. I just saw my brother jump out of a car and get a gun placed on him.

Q. Okay. And that's what he said he was going to talk about too. Right?

53

RR56

Q. That's what happened.

Q. That's what happened that he said he was going to talk about what happened?

A. No, the case itself; that he didn't have a gun. He didn't have drugs, pills, none of that.

Q. And that's what Gregory Morgan said he was going to talk about in your day in court before a fair judge. Right?

A. Yes, sir.

This witness and Mr. Morgan discussed this case and had prepared their testimony for over a year. Despite having a year to prepare, this witness testified to facts that were contrary to the defendant's own testimony regarding his conversations with Mr. Azzarano about trial strategy and the matter being an "open and shut" case. Not only does this testimony conflict with the defendant's, but clearly corroborates Mr. Azzarano's testimony that he never made such comments to the defendant. In this regard, the witness testified on re-direct by Mr. Altschuler:

N.T., 08-24-2012, P. 84:

Q. Do you remember when I was asking you whether you discussed witnesses with your brother, and I think your response was something to the effect of the whole neighborhood --

A. The whole neighborhood saw it.

Q. That's right.

A. The whole neighborhood saw it. The whole neighborhood saw it, so all of us can come and testify. I told Russell that at his preliminary, the 35th District is only around the corner. You can get everybody at the 35th District. But if it goes downtown, you're going to lose witnesses, because people don't like to come downtown to be witnesses. Why your lawyer telling you not to bring witnesses to the 35th, I have no clue on that. And he said, yo. He says, it's open and closed. They don't have no gun. I ain't have no gun, so they don't have no gun. It's open and closed. That's what I

N.T., 08-24-2012, P. 85:

54

RR57

[1] said.

This testimony conflicts with the defendant's position that the case was "open and shut" per the advice of Mr. Azzarano, as it appears that this was either the defense position from the time of the preliminary hearing, held well before Mr. Azzarano was retained by the defendant and entered his appearance, or a misunderstanding by the defendant of the advice/discussions with the Public Defender. This Court resolves this conflict in favor of Mr. Azzarano, since the defendant cannot establish by a preponderance of the evidence that it was, in fact, the advice and legal conclusion of Mr. Azzarano, given the timing of these statements made by the defendant to his brother at or around the time of the preliminary hearing.

Lastly, as to this witnesses availability for trial, he stated:

N.T., 08-24-2012, P. 85:

[2] Q. Okay. But let's focus on the trial.
[3] Forget about other witnesses. I only want to focus on
[4] you.
[5] A. Right.
[6] Q. Were you available on February 29th to come
[7] to this trial?
[8] A. Yes, I was.
[9] Q. And did your brother indicate whether or
[10] not he needed you at trial?
[11] A. He said he didn't need me.

Consistent with this Court's conclusion, as with all of the defendant's alleged eyewitnesses, although he was available to testify at trial, Mr. Azzarano could not have known of his existence, further his testimony failed to provide any favorable testimony that would have aided or assisted on behalf of the defense. This witness not only corroborated the testimony of Officer O'Brien, but that of Mr. Azzarano as well.

The defendant then called his last alleged eyewitness, his other brother, Carl Carpenter. On the date of his brother's arrest, the witness saw the defendant at the playground, who then

55

saw him leave and get into a car. (N.T., 08-24-2012, P. 89, L. 16 – 25). His attention was drawn

back to that car when he heard the sound of screeching tires. He saw his brother jump out of the

vehicle and the officers telling him to get down on the ground. (N.T., 08-24-2012, P. 90, L. 8 –

22).

This witness heard the police tell his:

brother to get on the ground. He got on his knees.
That's when they was telling him to put his face to the
dirt. He told them he wasn't doing it.
Q. Okay. So what happened then?
**A. That's when one officer came and wrestled**
**him down to the ground.**
Q. Okay.
A. And then held his knee into his neck.
Q. Okay.
A. My oldest brother told him to get his knee
off his neck because he got a bullet in his neck. That
officer told him he don't give a damn.

(N.T., 08-24-2012, P. 92, L. 3 – 15). [Emphasis added.]

...

Q. Did you ever see your brother run or flee

from the police?
A. No, he didn't have time to.
**Q. Did you see him discard any items?**
**A. No, he didn't have time to.**

(N.T., 08-24-2012, P. 92, L. 25 to P. 93., L. 4). [Emphasis added.]

The witness was then questioned about his availability to testify at trial. This witness

never told his brother he would testify on his behalf:

...had
you ever discussed with him your willingness to be a
witness for him?
A. Well, **I didn't actually tell him**, because
he already knew I would be there. It's my brother.
Q. Got you.
So in other words, you never said, hey,

56

brother, if you need me as a witness, I'll be there for you?

A. No. ...

(N.T., 08-24-2012, P. 95, L. 10 – 19). [Emphasis added.]

Since this witness never told his brother he was willing to testify on his behalf and the defendant did not testify that his brother was a witness, it can be reasonably concluded that Mr. Azzarano could not have known nor should he have known of the existence of this particular witness. For the defendant to fail to specifically tell his attorney that his own brothers were eyewitnesses to these events belies belief. The defendant never named a single individual to Mr. Azzarano and now complains of the failure to produce witnesses when he, himself, failed to ever identify anyone , including through the post-trial phase.

While still under direct examination the witness testified:

**Q. Did your brother ever tell you whether he needed you to come to court or whether he did not need you to come to court?**
**A. He kept telling me he didn't need me. The** lawyer said it was an open and shut case; he didn't have a gun.
Q. Did any lawyer other than me ever ask you what you saw or what you know about this incident?
A. I don't even know the other lawyer. Never seen him, met him, talked to him, wrote a letter to me, text me, nothing.

(N.T., 08-24-2012, P. 96, L. 14 – 24). [Emphasis added.]

On cross-examination, this witness stated that at the time of the arrest there were "25, 30, maybe more" people at the playground and that he knew "95 percent" of them. (N.T., 08-24-2012, P. 102, L. 2 – 7). After the incident, he stated that there were maybe even more people around. (N.T., 08-24-2012, P. 103, L. 7 – 11), which contradicts prior witness testimony.

57

RR60

He also stated that he had a clear view of the arrest and if something was discarded, he would have been able to see it. (N.T., 08-24-2012, P. 102, L. 23 – 25). He further stated:

> [7] **Q. Did you see the defendant drop a cell**
> [8] **phone?**
> [9] **A. I didn't see him drop anything.**
> [10] Q. Did you see a cell phone lying on the
> [11] ground where he was?
> [12] A. No, because I was too busy arguing with the
> [13] cop about his smart remarks …

(N.T., 08-24-2012, P. 104, L. 7 – 13). [Emphasis added.]

This also contradicts the previous testimony of the defendant's own witness.

These three witnesses provided testimony that clearly corroborated much of Officer O'Brien's trial testimony in regard to facts not contained in the arrest memo, i.e, the officers drawing their service weapons, the car being driven in reverse, the defendant jumping out of the vehicle, the vehicle fleeing, the number of people around the scene, the use of K-9 dogs searching the park, etc. Such corroboration was Mr. Azzarano's initial concern in preparing his defense and trial strategy in attacking the officer's credibility by pointing out the lack of specificity in the arrest memo. If anything, these witnesses corroborated the accuracy and credibility of Officer O'Brien's testimony and did not aid the defense.

Had these witnesses testified at trial, Mr. Azzarano's entire cross-examination of Officer O'Brien in regard to the lack of detail and specificity in his arrest memorandum as to the facts related to the arrest of the defendant would have been confirmed through these witnesses. This would have soundly defeated his defense strategy that Officer O'Brien was lying in regard to his version of events since most of the pertinent and important details of his testimony were absent from the arrest memorandum. These witnesses only served to strengthen that testimony.

58

Basically, the only facts that these witnesses didn't corroborate was the length of the chase and the contention that a pill bottle, money and a gun was discarded by the defendant. One witness stated he saw the defendant drop his cellphone when jumping from the vehicle, which a second was certain that nothing was dropped or discarded when he exited the car. This also was contradicted by the defendant's own statement to the police shortly after being arrested that he had dropped money near his daughter's car for her to pick up. This Court even questions if these three biased witnesses were even at the scene at the time leading up to the arrest or were told of the events by the defendant thereafter. For these reasons, this Court found them not credible.

The key issue in this case was whether or not the defendant discarded a weapon. This Court concluded that he did discard a weapon in reaching its verdict on March 7, 2012 and still maintained the same position upon the conclusion of the defendant's post-trial motions. None of the testimony that these witnesses provided this Court would lead it to conclude that the outcome of this case would have been different had they testified at the original trial of this matter.

These witnesses were consistent in their testimony on the general facts of the case and all basically told the same exact story, including the same use of certain words and relative distances, including the word "wrestle", to describe the manner in which the police took the defendant to the ground. See N.T., 08-24-2012, P. 32, L 10 (Gregory Morgan); P. 71, L. 8 (Derrick Carpenter) and P. 92, L. 8 (Carl Carpenter). Yet they contradicted one another on the subtle and important details of the case.

The testimony of these three witnesses seemed well rehearsed amongst them for presentation to this Court on the generalities of the case. This conclusion is not to infer that Mr. Altschuler was involved in coaching their stories, as he zealously argued his client's position and what he was told by his client and these witnesses. It does clearly indicate, however, some

59

degree of collusion between the defendant, his brothers and his long-time friend in preparing for their testimony, which one witness described as talking about the case for over a year. This clearly casted doubt as to the veracity of their testimony.

In light of this determination, this Court dismissed their testimony in regard to providing truthful, unbiased testimony, as legitimate concerns as to their credibility were raised. It is well established that the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Commonwealth. v. Smith*, 2013 PA Super 100 (Pa. Super. Ct. May 1, 2013).

The defendant called his last witness, John Della Rocca, Esquire, to the stand. Prior to the start of Mr. Della Rocca's testimony a stipulation was put on the record as follows:

> "Your Honor, it's hereby stipulated by and between the Commonwealth of Pennsylvania and defendant Russell Carpenter through the undersigning counsel that a document was created by John Della Rocca, Esquire, that clearly stated, one, defendant Russell Carpenter wished to testify on his own behalf at the time of trial; and, two, defendant Russell Carpenter wants to discuss his witnesses to the events leading to his arrest on or about August 18, 2011. (In the stipulation no names and date of births were provided.) It is further stipulated that the document containing the information in the above-numbered paragraphs was provided by Attorney Della Rocca in the form of a referral letter to Jeffrey Azzarano, Esquire, at the start of Mr. Azzarano's representation of defendant Russell Carpenter in the above-captioned matter which proceeded [sic] the trial of this case by several months."

N.T., 08-24-2012, P. 124, L., 22 to P. 125, L. 17.

Mr. Della Rocca had previously represented Mr. Carpenter in several traffic court matters. During the course of that representation, the defendant advised Mr. Della Rocca of these charges and he referred the defendant to Mr. Azzarano for representation in this case due to a conflict. Mr. Della Rocca met with and interviewed the defendant. At that time, he "wrote down a few things he said." N.T., 08-24-2012, P. 127, L. 12 to P. 128, L. 3.

60

Mr. Altschuler questioned Mr. Della Rocca on the details of the interview as follows:

> Carpenter whether or not -- strike that. Do you
> remember Mr. Carpenter telling you about witnesses in
> this case?
> A. Yes. I remember when we first met he was
> pretty adamant that he thought he was getting a bad
> deal and didn't have a gun. And he told me from the
> get-go that, you know, there was several people that
> saw what happened.
> **I remember him mentioning either an**
> **older black gentleman or a woman who lived nearby that**
> **observed the entire thing as well as a couple other**
> **guys that were standing nearby** I guess a playground or
> a basketball court that also observed what happened.
> **He didn't give me any names at the**
>
> **time, but he did mention that there were at least** <u>**three**</u>
> **witnesses,** possibly more, at that time. I should have
> written it down in my notes.

N.T., 08-24-2012, P. 128, L. 12 to P. 129, L. 3. [Emphasis added.]

It should be noted that Mr. Altschuler also failed to proffer any identifying information on these alleged witnesses identified by defendant to Mr. Della Rocca.

Mr. Della Rocca testified that because he would not be representing the defendant, he did not inquire further of the defendant for information to the identity of these alleged witnesses. He simply provided the information to Mr. Azzarano for him to follow-up. N.T., 08-24-2012, P. 129, L. 4 – 22.

On cross-examination, Mr. Della Rocca acknowledged that this meeting with the defendant occurred after the preliminary hearing had taken place and that he did not formulate strategy with Mr. Azzarano. N.T., 08-24-2012, P. 130, L. 16 – 25.

As the record reveals, in the timeline of this case, the number of alleged eyewitnesses multiplied as time passed. Initially with Mr. Della Rocca, there were several potential witnesses, which increased to "6 to 12" and then to "dozens", which then increased to hundreds, and in the

61

end, we were back to just three witnesses, none of whom were the witnesses initially, albeit, vaguely, identified to Mr. Della Rocca. Mr. Altschuler ended up calling the defendant's lifelong friend and two (2) brothers as witnesses.

This Court fails to see where Mr. Azzarano could have been faulted as it related to securing eyewitnesses who may have provided exculpatory testimony, when the witnesses were not identified by the defendant, were not named in discovery and, in reality, it appears that they did not exist. This Court concluded that all of the assertions of all of these witnesses were simply just that, baseless, non-meritorious assertions made by the defendant. This argument, in and of itself, lacks any degree of reliability or credibility and Mr. Azzarano could not have known nor should he have known of their existence.

Thereafter a stipulation was placed on the record that the preliminary hearing was conducted before Judge Robins on September 8, 2011 (at which time, the defendant was represented by Public Defender Stanfield) and that Mr. Azzarano entered his appearance on November 9, 2011, two months later. The Notes of Testimony from the preliminary hearing were also accepted into evidence. At this time, the defendant rested on his motion.

The Commonwealth called just one witness, Detective James Poulos, Badge No. 9260, of the Northwest Detective Division, to rebut the testimony of Officer Andrejczak, the ballistics expert. Since this Court disregarded the testimony of Officer Andrejczak due to it being deemed irrelevant in this case, it also disregarded the testimony of Detective Poulos, as his appearance was as a rebuttal witness. Detective Poulos' testimony addressed policies, procedures and directives on the handling of firearms or items that appeared to be firearms submitted for ballistic testing. Again, since no gun was recovered in this case, this line of inquiry was wholly irrelevant

62

and, once again, the case simply defaulted back to the credibility of Officer O'Brien's trial testimony and the credibility of the defendant's witnesses.

In light of all of the foregoing testimony and argument, this Court weighed the testimony of all of the fact witnesses and determined that the defendant failed to meet his burden of proof that he was entitled to a new trial. This Court concluded that Mr. Azzarano was effective trial counsel and that the evidence was sufficient for this Court to conclude that the defendant was in possession of a firearm that he discarded and which was not subsequently recovered.

Based upon these findings, on September 5, 2012, this Court denied the defendant's post-trial motion for a new trial.

### LEGAL ANALYSIS

The defendant's right to counsel, guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution, is violated where counsel's performance "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Rios*, 591 Pa. 583, 600, 920 A.2d 790, 799 (2007).

In this matter, this Court determined that Mr. Azzarano's representation of the defendant did not undermine the truth-determining process, as the sole issue boiled down to the witnesses' credibility. This Court weighed Police Officer O'Brien's testimony to that of the three alleged eyewitnesses, all of whom had a personal relationship with the defendant. As was Mr. Azzarano's original concern, these witnesses did, in fact, corroborate much of the officer's testimony. As stated above, one even corroborated Mr. Azzarano's testimony as to the issue of the case being "open and shut."

63

### Failure To Call Eyewitnesses

The primary premise of defendant's PCRA motions addressed ineffectiveness of Mr. Azzarano for his failure to call potential eyewitnesses. In order to establish counsel's ineffectiveness, defendant needs to show that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Commonwealth v. Sneed*, 45 A.3d 1096, 1108–09 (Pa.2012).

The defendant clearly failed to meet the third and fifth prongs of this test, and this Court is skeptical of who was presented by the defendant to meet the first prong. Without meeting all five (5) prongs, the defendant's claim fails.

To demonstrate prejudice when such a claim is raised, a defendant "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Sneed*, 45 A.3d at 1109. Counsel will not be found ineffective for failing to call a witness "unless the petitioner can show that the witness's testimony would have been helpful to the defense. A failure to call a witness is not per se ineffective assistance of counsel for such decision usually involves matters of trial strategy." *Id.* (cited by *Commonwealth v. Matias*, 2013 PA Super 53, 63 A.3d 807, 810-11 (Pa. Super. Ct. 2013)).

The witnesses 'identity' was solely within the knowledge of the defendant and he failed to share pertinent information related to these witnesses with Mr. Azzarano. Since the defendant failed to provide "the names and whereabouts of these witnesses" to Mr. Azzarano, he has no one to fault but himself. *Commonwealth v. Hunter*, 554 A.2d 550, 557-558 (Pa. Super. 1989).

Since Mr. Azzarano was not aware nor made aware of these witnesses, the defendant failed to meet the third prong of the test. Even if he knew or should have known of them, the witnesses' testimony was not beneficial to the defense. Thus, defendant has also failed to meet the 5th prong of the test.

Mr. Azzarano's "failure" to call witnesses did not constitute *per se* ineffectiveness, *Commonwealth v. Cox,* 603 Pa. 223, 983 A.2d 666, 693 (2009), but generally involved a matter of trial strategy. *Commonwealth v. Lauro,* 819 A.2d 100, 105 (Pa.Super.2003), *appeal denied,* 574 Pa. 752, 830 A.2d 975 (2003). In this case, this Court determined that these witnesses called by the defendant would not have been helpful to the defense, in that their testimony clearly defeated the trial strategy of Mr. Azzarano which he had testified was to "concede nothing" as it related to the facts in order to attack the police officer's testimony and credibility.

It should be noted that Mr. Altschuler had the same information regarding the purported witnesses generally referenced by Mr. Della Rocca in his referring letter to Mr. Azzarano, yet none of these witnesses were presented by Mr. Altschuler in the post-trial hearings, which would have provided more reliable support for the defendant's requested relief.

Mr. Altschuler produced nothing to support the position that Mr. Azzarano's representation was less than diligent. Despite counsel's zeal, this entire post-trial process failed to produce any reliable evidence for this Court to reconsider its prior adjudication, or to conclude that Mr. Azzarano was ineffective in his defense of the defendant.

Mr. Azzarano produced no witnesses at trial under his well-reasoned trial strategy. Mr. Alschuler produced three, none of whom could be deemed unbiased given their relationship to the defendant, and who did, if fact, corroborate much of the trial testimony of Officer O'Brien,

65

which was Mr. Azzarano's initial concern, especially in light of the lack of details in his arrest memo.

Mr. Della Rocca's interview notes to Mr. Azzarano vaguely identified several potential witnesses. The information in these notes was as equally available to Mr. Altschuler before or during the post-trial hearing phase, yet he also failed to secure the attendance of these individuals as well. Furthermore, none of the "dozens" of independent eyewitnesses who were allegedly in the area where and when the defendant was arrested were presented to this Court by Mr. Altschuler. Instead, he presented three (3) biased witnesses who were never previously identified by the defendant to Mr. Della Rocca, Mr. Azzarano or this Court during his testimony about potential witnesses. The persons were finally identified at the very last hearing on August 24, 2012.

During the testimony of the defendant in the post-trial stage, he was adamant that he told Mr. Azzarano of the existence of witnesses and said that he knew they would have testified. Still, he never testified that he had even told Mr. Azzarano that his own brothers were witnesses. This clearly defies logic that if he knew of witnesses, he would have named at least one by name or relation to his counsel. This is further supported by Mr. Della Rocca's testimony that there were a "couple of guys" near the playground, not "his brothers" who were near the playground. Despite ample and numerous opportunities to do so, the defendant failed to provide specifics to anyone. When reviewing all of the evidence, this raised this Court's skepticism that these other witnesses even existed in relation to the first prong.

During post-trial argument, defendant's counsel relied upon *Commonwealth. v. Mabie*, 467 Pa. 464, 471, 359 A.2d 369, 372 (1976), in regard to Mr. Azzarano's failure to interview witnesses prior to trial, however, that case is factually distinguishable from the case at hand.

In *Mabie,* defendant's counsel was shown the Commonwealth's file which contained the statement Mabie gave to the police, a police officer's description of Mabie when arrested and *the names of several eyewitnesses.* Defense counsel decided not to interview those named eyewitness to the incident based only upon the testimony of one witness at the preliminary hearing and the conversation with Mabie.

The *Mabie* Court determined that the "value of the interview is to inform counsel of the facts of the case so that he may formulate strategy. Perhaps, after questioning these witnesses, counsel may have concluded that the best strategy was not to call them due to hostility and, as a matter of strategy. That decision on counsel's part would not be subject to a claim of ineffective assistance of counsel." *Commonwealth v. Owens,* 454 Pa. 268, 312 A.2d 378 (1973). However, no such claim of strategy can be attached to a decision not to interview or make an attempt to interview eyewitnesses prior to trial. *Commonwealth v. Mabie,* 467 Pa. 464, 475, 359 A.2d 369, 374 (1976).

The key difference here is that Mabie's counsel had actually been provided with the specific names of eyewitnesses and failed to take any action. In this case, Mr. Azzarano was never provided with specifics regarding the witnesses claimed by the defendant, and was only provided vague generalizations about various witnesses. He just assumed that dozens would appear on his behalf. Despite being out on bail prior to trial and despite time, place and opportunity to do so, the defendant never provided the names and addresses of these witnesses he knew of to trial counsel for further investigation. He never brought these alleged witnesses to meet with Mr. Azzarano during pre-trial preparation sessions.

Clearly, the reasoning and holding of *Mabie* does not apply here as these matters are factually distinguishable as it relates to trial counsel's effectiveness. In *Mabie,* counsel knew or

67

should have known of the witnesses, here, Mr. Azzarano had no way of knowing the names of any witnesses as they were not listed in discovery and never identified to him by the defendant.

Granted, the defendant's daughter was identified in the police report, but that information was provided to the investigating officers *by the defendant himself,* as simply being the owner of the red Volvo where he dropped the money because he knew she would pick it up. She was not listed as an eyewitness in the reports, nor did she ever appear on the defendant's behalf to provide testimony to this Court to support any of defendant's post-trial arguments. She did appear in Court for one post-trial hearing, but she was not called to testify by Mr. Altschuler.

Essentially, the trial strategy employed by Mr. Azzarano was the same trial strategy employed by Mr. Altschuler during the post-trial proceedings. Aside from the defendant's brothers and his long-time friend, PCRA counsel never identified these numerous other alleged eyewitnesses on the record, apparently none were ever subpoenaed to appear by him and there was no mention of an investigator being employed to determine the identity of these numerous witnesses, despite six (6) months passage from the time of the defendant's conviction to the time of the last post-trial hearing.

For post-trial counsel to criticize trial counsel as to his preparedness or lack thereof and then take an identical course of trial strategy, leads this Court to reasonably conclude that none of these dozens of alleged witnesses were even known to the defendant and they were simply baseless claims made by the defendant to both of his counsel.

As a result, this matter complained of on appeal lacks factual or legal support and this Court's conclusion should be upheld on appeal.

### Failure to Call an Expert Witness

68

As for complaints that Mr. Azzarano failed to call a ballistics expert, this position is specious at best, since a gun was not recovered. An expert witness cannot provide 'expert testimony' in regard to whether the gun in this case was, in fact, a "real" gun, since he could not examine it. This strategy is without merit. Counsel cannot be considered ineffective for failing to assert a meritless claim or legal position. *Commonwealth v. Perry*, 403 Pa. Super. 212, 221, 588 A.2d 917, 921 (1991) (citing *Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504 (1989); *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985).

Mr. Altschuler chose to use the word "real" throughout the PCRA hearing. The use of this word is simply being used as a synonym for "operable". However, there is a presumption of operability, and the Commonwealth needs only to prove operability if a defendant presents credible evidence sufficient to raise a reasonable doubt as to operability. *Commonwealth v. Horshaw*, 346 A.2d 340 (Pa.Super. 1975). The gun was determined to be "real " by this Court's acceptance of Officer O'Brien's testimony. Proof of "operability," in this case, was irrelevant, since it was not recovered. A fact finder can infer operability, i.e., a "real" firearm, from the testimony when the weapon is not recovered. *See Commonwealth v. Yaple*, 238 Pa.Super. 336, 357 A.2d 617 (1976) and *Commonwealth v. Holguin*, 254 Pa.Super. 295, 385 A.2d 1346 (1978).

Officer Andrejczak's testimony could not provide an expert opinion in this case to assist in the defense. Further, he cannot provide expert testimony as it relates to credibility, so, as stated, both aspects of his testimony were disregarded by this Court in reaching its determinations. Therefore, this position of defendant was without merit and not indicative of the ineffectiveness of Mr. Azzarano at trial.

Basically, Officer Andrejczak was called to testify as to the operability issue, which Mr. Azzarano argued at trial as part of his defense, yet was criticized by Mr. Alschuler and

69

questioned extensively on the issue, but, once again, he employs the same arguments in the post-trial motions.

In light of all of the evidence, this Court concluded that Mr. Azzarano was effective trial counsel despite not calling a ballistics expert at trial. *See Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1265 (1994) (holding that "trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony").

In reaching this determination, and since utilizing an expert witness at trial falls within counsel's trial strategy, this Court applied the three-pronged test to be applied when trial counsel is alleged to have been ineffective as stated in *Commonwealth v. Pierce*, 515 Pa. at 157, 527 A.2d at 975, as it relates to the performance and prejudice test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

The *Strickland/Pierce* test requires a petitioner to prove: (1) the underlying legal claim was of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and (3) the petitioner was prejudiced — that is, but for counsel's deficient stewardship, there is a reasonable likelihood the outcome of the proceedings would have been different. *Pierce*, 515 Pa. at 158-59, 527 A.2d at 975.

If a petitioner fails to prove any of these prongs, his claim fails. *Commonwealth v. Williams*, 594 Pa. 366, 378, 936 A.2d 12, 19-20 (2007). Moreover, counsel is presumed to be effective, and a petitioner must overcome that presumption to prove all three *Strickland/Pierce* factors. *Commonwealth v. Singley*, 582 Pa. 5, 19, 868 A.2d 403, 411 (2005).

In proving the second prong, i.e., the "reasonable basis" prong, this Court concluded that counsel's chosen strategy had a reasonable basis and the defendant failed to prove that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Williams*, 587 Pa. 304, 899 A.2d 1060, 1064 (2006).

In attempting to establish the third prong, i.e., prejudice, the defendant also failed to show that there was a reasonable probability that the outcome of the proceedings would have been different, but for Mr. Azzarano's action or inaction. *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 954 (2008); *Commonwealth v. Matias*, 2013 PA Super 53, 63 A.3d 807, 810 (Pa. Super. Ct. 2013).

The defendant may only have obtained relief if he had plead and proved by a preponderance of the evidence that his conviction resulted from ineffective assistance of counsel, that, under the circumstances, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *See* 42 Pa.C.S. §9543(a)(2)(ii).

In this case, the defendant failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *accord Commonwealth v. Cox*, 603 Pa. 223, 243, 983 A.2d 666, 678 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Commonwealth v. Ali*, 608 Pa. 71, 86-87, 10 A.3d 282, 291 (2010).

This expert's testimony was not applicable here, since a weapon was not recovered and Officer O'Brien was not the officer who had previously misidentified a replica firearm as being a "real" firearm. Officer Andrejczak's testimony addressed examinations of 'firearms' that were actually recovered and made available to the Firearm Investigation Unit for examination in order

71

to determine operability. An expert witness cannot opine on the operability of a weapon that is not recovered. In light of these two (2) significant, distinguishing factors, this Court gave no weight to this expert's testimony from either a credibility or evidentiary standpoint and Mr. Azzarano, therefore, cannot be faulted for failing to employ a baseless strategy.

In the instant matter, this Court concluded that the defendant failed to meet all three of the required prongs by a preponderance of the evidence. The underlying argument was proven to not have any merit; that Mr. Azzarano had a reasonable basis for employing his trial strategy, which was compounded by the evidence and testimony provided during the post-trial process; and, the outcome would not have been different had a ballistics expert been called at trial.

This matter complained of on appeal lacks any meritorious basis and this Court's finding on this issue should be upheld on appeal.

### Ineffective Assistance for Failure to Cross-Examine

The third matter complained of on appeal addresses Mr. Azzarano's failure to cross-examine Officer O'Brien on his preliminary hearing testimony in regard to whether he thought the gun was "real".

The Preliminary Hearing Notes reflect that Officer O'Brien's testimony was consistent with his testimony from the February 29, 2012 trial in regard to both the events of that day and, in particular, the description of the gun discarded by the defendant.

The questioning that defendant contends Mr. Azzarano was ineffective for failing to ask at trial is based upon a single question on cross-examination at the preliminary hearing:

> [15] Q. As you sit here today, you can't say for
> [16] certain that was a real gun, right?
> [17] A. That's right.

72

(N.T., 09-08-2011, P. 9, L. 15 - 170

When the transcript is read in its entirety and as a whole, this one question does not negate Officer O'Brien's testimony. Had it been asked at trial before this Court, it would not have changed the outcome of the trial, as a determination as to whether it was a real gun or not falls to the trier of fact weighing all of the evidence. Such a question addresses credibility and not weight of the evidence.

There was ample evidence to support this Court's finding that the defendant possessed a firearm while a felon. While fleeing on foot, the defendant discarded a pill bottle, money, and a gun, described as "a normal size black gun, six, seven inches, a semi-automatic gun". Officer O'Brien stated that he has recovered 48 guns in making arrests and due to this, and his experience and training, he "immediately" recognized it as a gun.

This officer's experience enabled this Court to credit his testimony that he observed the defendant discard a semiautomatic firearm, the pill bottle and money (affirmed by the defendant) during the police chase. *See Commonwealth v. Pestinikas*, 617 A.2d 1339, 1347 -48 (Pa. Super. 1992) *(en banc)* (attempt to conceal evidence is admissible as evidence of consciousness of guilt and "may, along with other evidence in the case, form a basis from which guilt may be inferred"). *See also Commonwealth v. Rizzuto*, 777 A.2d 1069, '1078 (Pa. 2001) (evidence of flight shows a consciousness of guilt). Defendant may not ask this Court to view the evidence in the light most favorable to himself and find that the officer was incorrect in his observations. *See Commonwealth v. Dougherty*, 860 A.2d 31, 36 (Pa. 2004) (sufficiency claim attacking credibility of the evidence is not sufficiency claim at all; it is a weight claim and therefore fails).

73

When viewed in its entirety, this Court's conclusion that the underlying proceeding would not have been different had this question been asked by Mr. Azzarano is supported by the evidence taken in the post-trial proceedings.

Under a totality of the evidence review this Court, finds Mr. Azzarano's trial strategy was not have ineffective and he employed a reasonable basis that was designed to effectuate his client's interest. *See Commonwealth v. Poindexter*, 435 Pa.Super. 509, 646 A.2d 1211, 1217 (1994). Even in hindsight, this claim of ineffectiveness by defendant could not have succeeded when comparing Mr. Azzarano's trial strategy with the alternative strategy employed by Mr. Altschuler. *Commonwealth v. Hammond*, 953 A.2d 544, 558 (Pa.Super.2008) *appeal denied*, 600 Pa. 743, 964 A.2d 894 (2009). The failure to ask this one question would not have changed the outcome of the trial.

### Sufficency of the Evidence

Lastly, the defendant claims that the evidence was insufficient as a matter of law to support the conviction of the defendant on the charges of Possession of a Firearm Prohibited, Firearms Not to be Carried without a License, and Carrying Firearms on Public Streets in Philadelphia because the evidence did not establish beyond a reasonable doubt that the object observed was a "real" firearm.

The evidence, both direct and circumstantial, taken at trial allowed this Court to determine that each and every element of the crimes charged were established beyond a reasonable doubt. Evidence is deemed sufficient to support the underlying convictions if there is testimony offered to establish each material element of the crime charged and to prove commission of the offense by the accused beyond a reasonable doubt. The question of credibility

74

is left for the fact-finder and the verdict will not be disturbed if the fact-finder determines the evidence is worthy of belief. *Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167, 1170 (Pa. 1993).

The evidence here was more than sufficient to sustain defendant's convictions for violations of the Uniform Firearms Act. Defendant challenges the sufficiency of the evidence to prove his firearm convictions arising under 18 Pa.C.S. §§ 6105, 6106, and 6108.

A person violates §6105 when he possesses a firearm after he has been convicted of one of the enumerated offenses. A person violates §6106 of the Uniform Firearms Act if he carries an operable, concealed firearm without a license. 18 Pa.C.S.A. §6106. Under 18 Pa.C.S.A. §6108, a person is guilty if he carries a "firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class," unless licensed to do so or is exempt from the license requirement. 18 Pa.C.S.A. § 6108. The elements of all three (3) crimes were met.

Officer O'Brien testified that the defendant concealed the weapon as he ran from him when he 'bladed' himself as he ran from the officer before abandoning it near the vehicle. The weapon was concealed by the defendant from the police as he ran and until he dropped it on the street.

As stated previously, this Court concluded that this was a real firearm based upon Officer O'Brien testimony describing the gun as he ran past it in pursuit of the defendant. This Court can infer that this was a "real" weapon per *Commonwealth v. Fitzhugh*, 520 A.2d 424, 432 (Pa. Super. 1987).

Defendant's argument that the evidence is insufficient because there is no proof that the unrecovered gun was "real' is essentially the same argument as the Commonwealth's failure to prove "operability" of a gun that was never produced at trial, but requiring such proof in light of

75

the ease with which a weapon can be discarded is absurd. *See Commonwealth v. Hammond*, 350 Pa. Super. 477, 482, 504 A.2d 940, 942 (1986).

This Court concluded that the defendant did unlawfully possess a firearm, concealed that weapon from view of the police officer when he was in the vehicle and also when he fled on foot, which he carried and subsequently disregarded while being chased on the streets of the City of Philadelphia.

In this case, the evidence of the Commonwealth was more credible than that of the defendant in regard to defendant's possession and concealment of a "real" gun that he discarded and was not recovered by police after the fact. The Commonwealth provided sufficient evidence to meet the elements of the crimes charged through the testimony of Officer O'Brien and the documentary evidence submitted by stipulation. The verdict is based upon reliable evidence and not surmise or conjecture. *Cf. Commonwealth v. Maxon*, 2002 PA Super 137 (Pa. Super. Ct. 2002).

For all of the foregoing reasons, this Court requests that the conviction of the defendant as well as the determination of his trial counsel as effective, be upheld on appeal.

BY THE COURT:

_____ J.
ANGELO J. FOGLIETTA

Cc:  Hugh J. Burns, Jr., Esquire - DA's Office
     Jonathan Altschuler, Esquire - Defendant's Counsel (PCRA and Appellate)
     Jeffrey Azzarano, Esq. - Defendant's Trial Counsel
     Karen Reid Bramblett, Esq. – Superior Court of Pennsylvania, Prothonotary